## UNION ICE CO. v. CROWELL et al.

### CROWELL et al. v. UNION ICE CO.

(Circuit Court of Appeals, First Circuit. March 22, 1893.)

#### Nos. 4 and 5.

1. SHIPPING—UNSAFE BERTH—DAMAGES—LIABILITY.

Libelant's schooner was berthed alongside respondent's wharf to load ice, and after the cargo was nearly all in she began to leak badly, showing signs of a severe strain by hanging up at the ends. It was shown that there was a greater depth of water under her amidships than at either bow or stern, and she was aground at the ends. At the bow there was a bed of sawdust, edgings, etc., of whose existence both her captain and the respondent were aware, but neither took any steps to investigate its extent or character, assuming that it was soft enough for the schooner to cut into it. Respondent had, however, examined the bottom for rocks, logs, or other hard substances, and removed such as were found. *Held,* that both the respondent and the vessel were in fault as to the unsafe berth, and libelants' damages should be divided.

2. SAME—PROXIMATE CAUSE.

A survey was had, and the surveyors recommended that the schooner be beached, and repaired temporarily, which was done without taking the ice out of her. The ice, softened by the water she had taken, suddenly shifted in the hold, and strained the vessel much worse than before. *Held,* that the unsafe berth was nevertheless the proximate cause of this injury, and damages therefor are recoverable.

3. SAME—MEASURE OF DAMAGES.

The measure of damages in such case is the cost of repairing the schooner, and not the difference between her value before and her value after the injury.

4. SAME—COSTS.

In admiralty the costs are under the control of the court, and do not necessarily follow the rule in cases at law or in equity. They may be denied in whole or in part to the prevailing party, or even allowed to the losing party, as, in view of all the facts, seems proper.

Appeals from the District Court of the United States for the District of Maine.

In Admiralty. Libel by Samuel R. Crowell and others against the Union Ice Company for damages to the schooner "Weybosset." The district court entered a decree for divided damages, and subsequently overruled respondent's exceptions to the assessor's report, at the same time sustaining in part and overruling in part the exceptions of the libelants. Both parties appeal. Affirmed.

The opinions of the court below, by WEBB, District Judge, referred to by the circuit court of appeals, are as follows:

(April 16, 1890.)

The owners of the schooner Weybosset prosecute this libel to recover for injury and damage to their vessel, caused, as they aver, by the unsuitable and dangerous condition of the bottom at the berth provided for loading vessels with ice from the respondent's ice houses on the bank of Penobscot river. The case shows that the Union Ice Company, proprietor of ice houses and a loading pier, contracted ice to be loaded at their pier, from their houses, and that the Weybosset, under a charter, proceeded thither to take a cargo. This brought her lawfully at the berth, and was such an invitation to come there as imposed on the owners of the pier the duty to employ reasonable diligence to have the place safe and proper for the vessel to lie. The Moorcock,

13 Prob. Div. 157; Sawyer v. Oakman, 1 Low. 136; Nickerson v. Tirrell, 127 Mass. 236; Trustees v. Gibbs, L. R. 1 H. L. 93; Higgins v. Gaslight Co., 33 Fed. Rep. 295.

The river bottom for considerable space above the pier and along outside the berth was obstructed with accumulated edgings, sawdust, shavings, and other similar materials, that had been thrown into the water at sawmills above. How long it had been there does not appear, but there is no pretense that it was of very recent deposit. That such an accumulation was there was known to the ice company. They had taken measures to ascertain that there were no logs, slabs, and other large bodies in the river bed, which, rising above the general level of the bottom, might become dangerous to vessels doing business there; but they had taken no precautions to remove this accumulation of lighter materials, nor, so far as appears in testimony, to mark the exact extent and position of it. The Weybosset was about 165 feet keel, and her hatches so arranged on her deck that, when lying so as to receive her cargo from the ice run, her bow would extend about 30 feet above the upper corner of the pier, and would project upon this material for nearly that distance. In front and below the pier the bottom was hard and solid. Soundings made by two different witnesses show that the depth of water at low tide, where the Weybosset loaded, varied, being, according to one set of soundings, at the bow, 6½ feet, and 12 at the stern, with a depth varying from the shoalest point to 16 feet about midships, and thence shoaling to 12 feet at 30 feet from the stern. According to the soundings made at the instance of the respondent, the depths range from 8.45 forward to 14 feet aft. These measurements, instead of showing a concavity of the bottom along amidships, show it to be convex, a raised portion of the bottom extending from about midway of the keel, aft about 30 feet, where the depth is from a foot to 1.3 feet less than at the stern, and an extreme of .8 of a foot less than at the point where the edgings, etc., leave off. They also show that in the distance of about 36 feet this pile of material rose with nearly a uniform incline to a height of 5.9 feet at the point where the stern of the schooner rested.

The vessel showed no signs of injury till shortly after her loading was completed, when she was found to be leaking badly, and giving evident indications that she had settled along amidships. Her spring stay was slacked, and hung loosely, which showed that in settling the tops of the masts came towards each other. This was precisely the effect that would follow loading heavily with the keel resting at the bow and at the stern, but unsupported in the middle. And the condition of the bottom, with the pile of edgings along at the vessel's head, was exactly a condition to hang the vessel up at the ends. That the injury did not make itself apparent before the entire cargo was loaded must be accounted for by the gradual increase of pressure avoiding any sudden action, and the power of the hull to resist the gradual strain. In consequence of the strain and settling, the schooner leaked very badly, and it was found necessary to beach her for repairs. The ice on board was practically lost by melting, and while she lay on the beach she suffered further damage. Temporary repairs were made, and she was taken to Boston, where she was thoroughly repaired.

There is some conflict as to the conversation between the captain and the ice company's superintendent in respect to the character of the berth before the vessel hauled in and made fast. The captain declares and the superintendent denies that the berth was guarantied. It is not of any importance whether it was or not. But I am of opinion that the captain somewhat too inattentively interpreted the words of the superintendent to be a warrant of the berth. It is admitted by both that the captain inquired as to the character of the place. The superintendent's answer implied, as he doubtless believed to be the truth, that it was safe to lie and load at. But neither he nor the other officers of the company had exercised proper care in respect to the condition of the bottom. They knew that there was an accumulation of edgings, but how high or how broad, or how far it extended up river, or how near it came to the pier, they had taken no pains to ascertain. They apparently assumed that, in the absence of rocks, or logs, or other large and hard substances, all was right. In all this they were at fault, and for damages occasioned by the unsafe accumulation, the presence and danger of which they

were bound to know, they must be held responsible. But the master admits that he was told that his vessel was larger than others that had loaded there; that the location of his hatches would require him to lie further up on the bunch of edgings. He exercised no care to ascertain the condition or the character of the bunch of edgings upon which he was notified that his vessel would rest. He took it for granted that the schooner would cut through whatever bank of materials from the sawmills she might run upon. He was negligent of duty, and careless in thus failing to make suitable inspection, and in too easy reliance upon the judgment of others. This was negligence on his part contributory to the result. In admiralty the rule is that there shall be apportionment of damages when there is fault and negligence on both parts. Christian v. Van Tassel, 12 Fed. Rep. 884; The Max Morris, 28 Fed. Rep. 881; Atlee v. Packet Co., 21 Wall. 389.

The libelants are therefore entitled to a decree in their favor for one half the damage arising from the unsafe condition of the berth, and for ascertaining that damage reference is made to Benjamin Thompson, Esq.

## Opinion of the Court on Exceptions to Assessor's Report.

### (August 11, 1891.)

WEBB, J. Both parties except to the report of the assessor. Of the respondent's exceptions, only the fourth demands any discussion, and this involves the consideration of the proximate cause of the injury to the libelants' vessel. It is unprofitable to cite cases in illustration of the maxim, "In jure non remota causa sed maxima spectatur," which is the basis of this exception. The principle is elementary. Its application to a given case is often difficult. Reported cases exhibit how it has been applied, and show the interpretation of special facts by courts. They manifest the difficulty, more than supply a guide to the principle. Each case must be determined by a careful analysis of its own conditions and circumstances. The influence and effect of a given cause will very naturally be differently judged by different minds. The discussion easily leads to metaphysical refinement and subtlety. In the present instance I have already decided that the vessel was damaged and set leaking by taking ground on the uneven bottom at the berth given her to load a cargo of ice at the respondent's pier, and that for the unsafe condition and character of that berth the respondent is liable.

It was only when the cargo was nearly or quite all on board that the vessel was loaded deep enough to press so heavily on the uneven surface as to strain and open her, and set her leaking freely. What occurred afterwards, while she was beached and receiving temporary repairs, it is contended is not attributable to the cause that hung the vessel up at the ends and strained her, opening her butts and seams. For the later injury, it is claimed, a new and distinct cause is responsible,—a cause arising from the negligence of the master. I cannot think so. It is true that, if the cargo had been at once discharged, much, perhaps all, of that later damage would have been avoided. But the respondent refused any assistance or advice to the captain in respect to the cargo. He acted upon his best judgment under the exigency, and upon the advice of surveyors. While he was diligently pursuing such measures as appeared prudent for the repair of the visible damage received, and for the rescue of the vessel and cargo from the peril arising from that damage, the ice, probably undermined by the water let into it through the openings occasioned by the improper bottom, suddenly shifted in the hold with force sufficient to draw the three pilings to which guys from the schooner's mast heads had been made fast, and to part the cable, also run to the shore to keep her steady. The vessel was thrown over on her side, and received the injury which is the subject of this contention between the parties.

It is, I think, altogether too narrow a view of these facts to say that the injury and wasting of a cargo like ice, and the shifting of that cargo consequent on its wasting, was independent of the strain of the vessel by the uneven bottom, or that we cannot look to anything prior to such shifting of the cargo for a cause of the injury it immediately occasioned. Warm river water must melt ice; no other result could be expected; and damage to the vessel following that melting is reasonably to be regarded as the result of the cause that admitted the water. The unsafe berth was specifically given for

taking an ice cargo, and that unsafety of berth led directly to all the subsequent loss. I overrule all the respondent's exceptions.

The libelants excepted to the assessor's ruling that the damages are to be ascertained by valuing the vessel before receiving injury and deducting her value in her damaged condition. I think this exception must be sustained. The rule is restitution,—the cost of repairs. The Catherine v. Dickinson, 17 How. 174. Fortunately the assessor has reported the damages made up according to that rule, and it is not necessary to recommit the case. The other exception of libelants is overruled.

The total, according to Schedule B of the report here approved, is $11,673.55, one half of which is $5,836.77, and for the proportion and amount, with interest from the date of filing the libel, a decree is ordered.

Question is made respecting costs. In admiralty, costs are under the control of the court, and do not necessarily follow the rule in cases at law or suits in equity. They are denied in whole or in part to the prevailing party, and sometimes are even allowed to the losing party, as, on a view of all the particulars of a case, seems to be proper. In this case, the reasoning of Lowell, J., in The Mary Patten, 2 Low. 196, 199, is cogent:

"If the loss is all suffered by one vessel, and her owner brings his libel, he will recover half his damages; and there is no reason why he should not, in general, recover his full costs. It is the ordinary case of a prevailing party recovering less than he asks for, and if there has been no tender or offer of amends, and no equity peculiar to the individual case, it is according to the sound and reasonable law of all courts that he should recover costs."

The criticism of this reasoning, found in The Pennsylvania, 15 Fed. Rep. 814, does not, in my view, impair its force; nor can I regard the case of The America, 92 U. S. 432, as a binding authority on this point. The question in that case received no discussion, and the citations at the conclusion of the opinion are of cases affirming the rule of apportionment of damages where there is mutual fault. In no one of those cases is any reference made to this subject of costs.

Decree, $5,836.77, and interest from date of filing libel, and costs.

Charles P. Stetson, for Union Ice Co.

Charles T. Russell, Jr., and Clarence Hale, for appellants.

Before COLT, Circuit Judge, and NELSON and CARPENTER, District Judges.

PER CURIAM. We are satisfied with the findings of fact and the conclusions of law reached by the learned district judge in this case, as expressed in his opinion, and the judgment of the district court is therefore affirmed.

———

THE RICHARD S. GARRETT.[1]

McCALDIN et al. v. THE RICHARD S. GARRETT.

(District Court, S. D. New York. April 1, 1893.)

SALVAGE—POSSIBILITY OF DAMAGE—PROBABLE LOSS TO BE CONSIDERED.

Where a tug in New York harbor was, in consequence of a collision, abandoned by her crew, and left with her engines still backing, and was immediately boarded by another tug, her steam shut off, and herself taken to a place of safety, the service lasting some three hours, and no other vessel being immediately at hand to render it, and the evidence left it doubtful whether, if assistance had not been so rendered, she would have sunk, at a damage of $1,500 to $2,000, or backed ashore at half that damage,

[1]Reported by E. G. Benedict, Esq., of the New York bar.