HARTFORD & N. Y. TRANSP. CO. v. HUGHES et al.

(District Court, S. D. New York. November 12, 1903.)

1. WHARVES—LIABILITY OF OWNERS FOR INJURY OF VESSEL—OBSTRUCTIONS IN BOTTOM.

It is the duty of a wharfinger to ascertain the condition of the bottom of the waters adjacent to his wharf which the public is invited to use, and if there are any dangerous obstructions to remove the same, or, if that cannot be done, to notify vessels using the wharf of their existence and position; and a general notice by the owners of a bulkhead to the master of a vessel of the depth of water, and that he must be responsible for any injury to his vessel while lying at the bulkhead, will not relieve such owners from liability for an injury caused by a rock projecting three feet from the bottom, of the existence of which the master was not notified.

In Admiralty. Action to recover for injury of vessel at respondents' bulkhead.

James J. Macklin, for libellant.
Alexander & Ash, for respondents.

ADAMS, District Judge. This action was brought by the libellant to recover the damages caused its barge, the H. & N. Y. T. Co. No. 3, and the cargo of stone on board, of which it was bailee, by sinking while lying at the respondents' bulkhead in the East river, at Ravenswood, Long Island, on or about the 1st day of July, 1895.

The barge was 123 feet long and about 28 feet wide, and drew, when loaded as she was this day, 7 feet 4 inches forward and 8 feet 6 inches aft. The bulkhead had been constructed for two or three months before the accident. It was 75 feet long and had a depth of water of about 6 feet, a short distance off the face, increasing towards the river

The barge was made fast at about the height of the tide at 6 o'clock in the morning and lay there, apparently without injury, through one tide but at the next tide, she was injured by having a hole knocked in her bottom by a sharp rock, which by a subsequent examination of the bottom was found to be projecting about 3 feet above the bed of the river.

Shortly after her arrival, the respondents, who were the consignees of the cargo, asked the captain to discharge it, as they were in immediate need of it, and they provided men for that purpose. Having ascertained, from the master, the draft of the barge, they also notified him that there were only about 6 feet of water in the berth and if she were injured there at low tide he would have to be responsible. They did not at the time know of the existence of the rock but supposed the bottom to be of hard sand. The master said he could not discharge at that time but would have to await the arrival of the superintendent of his company. When the superintendent came subsequently, and while the barge was on the bottom, during the first low tide, he had no men and did not attempt to get any, as he had been accustomed to have the barge lie aground without injury, but he directed the master to slacken up his lines, so that the barge would go further into the stream. This the master did and at the next tide, the barge went off from the face of the bulkhead so that she was lying at her stern 10 or 12 feet off and at her bow 2 or 3 feet off.

The examination of the bottom after the accident showed that the rock which did the injury, was about 18 feet from the bulkhead, with about 12 feet of water on it at high tide. The fall of the tide was 5 or 6 feet, depending somewhat upon local conditions, and it seems clear that the change of position did not affect the situation, because if the barge had remained in the first position, she would still have been subjected to the danger, which she afterwards encountered and caused her bottom to be punctured. How the barge happened to go through the first tide without apparent injury is not adequately explained.

The question to be determined is, whether the notice given by the respondents to the master, was sufficient to relieve them of the liability, which ordinarily attends the failure of wharfingers to be familiar with the nature of the bottom of waters adjacent to the wharves which they hold out to the public for use.

The law is well settled and is stated by the Supreme Court, in the following language:

"Although a wharfinger does not guarantee the safety of vessels coming to his wharves, he is bound to exercise reasonable diligence in ascertaining the conditions of the berths thereat, and if there is any dangerous obstruction to remove it, or to give due notice of its existence to vessels about to use the berths. At the same time the master is bound to use ordinary care and cannot carelessly run into danger. Philadelphia, Wilmington, etc., Railroad v. Philadelphia, etc., Steam Towboat Co., 23 How. 209 [16 L. Ed. 433]; Sawyer v. Oakman, 7 Blatchf. 290 [Fed. Cas. No. 12,402]; Thompson v. N. E. R. R. Company, 2 B. & S. 106, s. c. Exch. (1860) 119; Mersey Docks Trustees v. Gibbs, L. R. 1 H. L. 93; Carleton v. Franconia Iron and Steel Company, 99 Mass. 216; Nickerson v. Tirrell, 127 Mass. 236; Barber v. Abendroth.

102 N. Y. 406 [7 N. E. 417, 55 Am. Rep. 821]". Smith v. Burnett, 173 U. S. 430, 433, 19 Sup. Ct. 442, 43 L. Ed. 756.

In this case the court further said (page 435, 173 U. S., page 444, 19 Sup. Ct., 43 L. Ed. 756):

"In The Moorcock, 13 P. D. 157, defendants, who were wharfingers, agreed with plaintiff for a consideration to allow him to discharge his vessel at their jetty which extended into the river Thames, where the vessel would necessarily ground at the ebb of the tide. The vessel sustained injury from the uneven condition of the bed of the river adjoining the jetty. Defendants had no control over the bed, and had taken no steps to ascertain whether it was or was not a safe place for the vessel to lie upon. It was held that, though there was no warranty, and no express representation, there was an implied undertaking by defendants that they had taken reasonable care to ascertain that the bottom of the river at the jetty was not in a condition to cause danger to a vessel, and that they were liable. The judgment was sustained in the Court of Appeal, 14 P. D. 64, and was approved by the House of Lords in The Calliope (1891) App. Cas. 11."

It was further said (pages 435, 436, 173 U. S., page 444, 19 Sup. Ct., 43 L. Ed. 756):

"The Lord Chancellor remarked: 'In this case the wharfinger, who happens to be the consignee, invites the vessel to a particular place to unload. If, as it is said, to his knowledge the place for unloading was improper and likely to injure the vessel, he certainly ought to have adopted one of these alternatives: either he ought not to have invited the vessel or he ought to have informed the vessel what the condition of things was when she was invited, so that the injury might have been avoided.' Lord Watson: 'I do not doubt that there is a duty incumbent upon wharfingers in the position of the appellants towards vessels which they invite to use their berthage for the purpose of loading from or unloading upon their wharf; they are in a position to see, and are in my opinion bound to use reasonable diligence in ascertaining whether the berths themselves and the approaches to them are in an ordinary condition of safety for vessels coming to and lying at the wharf. If the approach to the berth is impeded by an unusual obstruction they must either remove it, or if that cannot be done, they must give due notice of it to ships coming there to use their quay.' And Lord Herschell: 'I do not for a moment deny that there is a duty on the part of the owner of the wharf to those whom he invites to come alongside that wharf, and a duty in which the condition of the bed of the river adjoining that wharf may be involved. But in the present case we are not dealing, as were the learned judges in the cases which have been cited to us, with the condition of the bed of the river in itself dangerous—that is to say, which is such as necessarily to involve danger to a vessel coming to use a wharf in the ordinary way; and we are not dealing with a case of what I may call an abnormal obstruction in the river—the existence of some foreign substance or some condition not arising from the ordinary course of navigation.'"

The respondents were maintaining a bulkhead wharf for public use which they could easily have ascertained (as they did shortly after the accident not only with respect to the rock in question but others which were there) was in a dangerous condition for the use of vessels drawing over 6 feet, and they took no sufficient steps to become familiar with its conditions for such use, although they invited the vessels there. If they had fulfilled their primary duty of ascertaining the condition and had notified the master of the boat of the existence of the rocks, and he had remained there with his boat and suffered the damage, the owner could probably not recover but, in view of the circumstances, I do not consider that the respondents can avoid the consequences of their neglect to ascer-

tain the condition of the bottom by endeavoring to throw the responsibility of remaining at the bulkhead upon the libellant, when nothing but a general warning was given the master to the effect that if anything happened he, not they, would be responsible.

There should be a decree for the libellant, with an order of reference, but, in view of the long delay in bringing the case to trial, without interest beyond the period of one year.