PHILADELPHIA & R. RY. CO. v. WALKER.

(District Court, D. New Hampshire. July 15, 1905.)

No. 368.

WHARVES—LIABILITY OF OWNER—INJURY TO VESSEL FROM INSUFFICIENT DEPTH OF WATER.

Libelant's barge, laden with coal, consigned to respondent, was delivered at the dock owned by respondent, to be there discharged by him in accordance with the bill of lading. She was placed in position for discharging by the master, who had never before been at the dock, on the assurance of respondent that there was sufficient depth of water, but grounded, and was injured owing to inequalities in the bottom over which there was insufficient water. *Held*, that respondent was liable for the injury in failing to exercise the care and diligence imposed on him by law as dock owner, and that the master had the right to rely on respondent's statements, and was not in fault in failing to take soundings himself.

In Admiralty.

W. H. Richardson and J. W. Kelley, for libelant.

Carver & Blodgett and Page & Bartlett, for respondent.

HALE, District Judge. This is a libel in personam by the owner of the barge Elmwood for injuries sustained by the barge in lying at the dock of the respondent. The libel alleges, and the answer admits, that a certain cargo of 1,248 tons of coal was shipped to the respondent upon the said barge, and, by the terms of the bill of lading, was to be delivered to him at his wharf, known as "Walker's Wharf," at Portsmouth, to be there discharged by him. The libel alleges that the barge grounded in the dock by reason of its uneven bottom, and particularly because of the existence of a ridge or bar running across it; the existence of both the uneven bottom and of the ridge being unknown to her master. The Elmwood was a wooden barge, 186 feet long, 35 feet beam, drawing 14½ feet forward and 15½ feet aft. On February 1, 1899, she left Philadelphia with her cargo in tow of the tug Argus. On February 10th she arrived at the wharf of the respondent at Portsmouth. The next morning she was taken in tow by a river tug, and brought up to the dock of the respondent, where she proceeded to discharge from her forward hatch. After the discharge of the forward hatch, it was determined to move the barge forward in the dock so as to locate the fourth hatch under the coal hoist, but whether this was at the instance of the respondent or of the captain of the barge is in dispute. The respondent, however, admits that he said to the captain that the berth was clear; that the captain said that he "thought the proper thing to do would be to take the stern hatch, the after hatch." The respondent testifies: "I told him it was all right; there was plenty of water. * * * He says, 'I will move her ahead, and take the stern hatch out, the fourth hatch next.' * * * I didn't say anything to him any more after that. * * * He never asked me for a guaranty until he was fastening, and then he says, 'It is all right?' and I says to

him, 'Yes, it is all right.'" After being moved forward, the barge grounded, and was injured. The testimony shows that the captain had never been in the dock before, but that the respondent had owned the dock 37 years, during which time it had been used for the discharge of vessels laden with coal. The respondent testified that he had never made any examination to ascertain the depth of the water in the dock, and that he had no knowledge, at the time the Elmwood grounded, of the existence of any ridge. After grounding, upon examination by divers, it was found that the barge was resting on the bottom under the fourth hatch for a distance of several feet, and that her stern was clear of the bottom; that forward of that point the barge was not resting on the bottom for a distance of 70 or 80 feet; that her bow was resting in the mud; that there was a bar under the fourth hatch, which run across the dock. It appears that this bar was about 13 feet under water at low water; that the barge was drawing about 14½ or 15 feet forward and 15½ feet aft, and that before she was docked her draught was made known to the respondent. The captain of the barge testifies that the safety of the barge was guarantied by the respondent. This the respondent denies. It is not important whether it was guarantied or not. The respondent admits that he told the captain that there was plenty of water at the point where he desired to place his barge in order to enable him to unload from the fourth hatch. He was bound to know the condition of his dock, and neither directly nor indirectly to invite a vessel to enter there unless the dock was reasonably safe. The barge came to her berth under such invitation, both express and implied, as imposed on the owner of the dock the duty to use reasonable diligence to have the place safe and proper for a vessel to lie. From the testimony I find that he did not use such diligence, and that the dock was not reasonably safe. In the Annie R. Lewis (D. C.) 50 Fed. 556, Judge Nelson says:

"The master, being ignorant of the channel, had the right to rely on the judgment of the respondent, who was present, and, receiving no warning of the danger from him, to assume that the water was sufficient for his vessel. The silence of the respondent under the circumstances was equivalent to an assurance that the depth of the water was sufficient, and amounted to an express invitation to enter."

See, also, opinion of Judge Webb in Stevens v. Donnell, unfiled memorandum decision.

In the case at bar the dock owner, not merely by his silence, but by express language, assured the captain of the barge that there was plenty of water. In addition to the representation which the law implies from the owner of the dock inviting vessels to enter, there was therefore in this case an express representation of safety. Although a dock owner does not guaranty the safety of vessels coming to his wharf, he is under the duty of exercising reasonable diligence in ascertaining the condition of the berths, and, if there is any dangerous obstruction, to remove it, or give due notice of

its existence to vessels about to use the dock. The court must come to the conclusion that the respondent was in fault.

It now becomes necessary to inquire whether or not the libelant was in fault. The captain of the barge relied upon the assurance of the respondent as to the condition of the dock. He took no soundings. He was prevented from taking such soundings for at least a part of the time by the ice in the dock; and he relied upon the assurance of the respondent as to the amount of water and the condition of the bottom. Under the circumstances of this case the testimony forces me to the conclusion that the master was justified in relying upon the statement of the respondent, and was under no duty to take soundings. The case presents a different state of facts from those in the Union Ice Co. v. Crowell, 55 Fed. 87, 5 C. C. A. 49. In that case Judge Webb held that the circumstances placed upon the captain the duty of making personal inspection, the master of the Weybosset having been told that his vessel was larger than others that had loaded there, and he having full opportunity to make personal investigation. Smith v. Burnett, 173 U. S. 430, 19 Sup. Ct. 442, 43 L. Ed. 756; Garfield, etc., Co. v. Rockland-Rockport, etc., Co., 184 Mass. 60, 67 N. E. 863, 61 L. R. A. 946, 100 Am. St. Rep. 543; The Calvin P. Harris (D. C.) 33 Fed. 295; The John A. Berkman (D. C.) 6 Fed. 535.

It is insisted also by the respondent that the barge was unseaworthy and improperly manned and equipped at the time of the injury. Without discussing the testimony bearing upon these issues of fact, the court is of the opinion that the barge appears by the evidence to have been in a reasonable condition of seaworthiness, and to have been properly manned and equipped at the time of the injury. I am therefore of the opinion that the libelant was not in fault.

The libelant is therefore entitled to a decree in its favor. Reference may be had to a master for an assessment of damages.