LOOK et al. v. PORTSMOUTH, K. & Y. ST. RY.

(District Court, D. Maine. October 24, 1905.)

No. 30.

1. SHIPPING—INJURY OF VESSEL WHILE DISCHARGING—LIABILITY OF CONSIGNEE.

It is incumbent on a consignee, required by the charter to discharge a vessel, to designate a suitable place for her to lie while discharging, and to know, as far as by reasonable effort it can be ascertained, that such place is reasonably safe; and this obligation extends to all the conditions in which the vessel is placed and to all the dangers to which she is exposed while effecting her discharge, and the consignee is responsible for the negligence or want of knowledge of its agent in charge of the work, through which the vessel is injured.

2. SAME—INJURY OF VESSEL AT DOCK FROM ELECTRIC WIRE.

Respondent, a street railroad company, was consignee of a cargo of coal, which it was to discharge at a certain dock. The owner of the dock, as its agent, had charge of the discharging, and during the work, to avoid the expense of winding the vessel to bring her after hatch opposite the discharging platform, moved her forward, until her headgear pro-

jected over a bridge and the track and feed wires of respondent's road thereon. Neither the master nor respondent's agent had any actual knowledge of any danger from the wires, and the agent assured the master that there was no danger to the vessel, although there might be danger of breaking the wires. During the night the vessel's chains settled against the wires, and she was set on fire by the electricity and injured. *Held*, that respondent was chargeable with knowledge of the danger, which it was bound to know, and that it was not relieved from liability by the want of knowledge of its agent; also, that the vessel was not chargeable with contributory fault because of the want of knowledge of the master, since it was not his duty to know, and he had the right to rely on the statement of respondent's agent.

In Admiralty.  Suit for injury to vessel while discharging.

Benjamin Thompson, for libelants.

Samuel W. Emery, for defendants.

HALE, District Judge.  The libelants, as owners of the schooner Frank W. Benedict, seek to recover damages sustained by the schooner while occupying Cutts' wharf at Kittery Point, Me., a wharf used by the respondent for the discharge and storage of its coal, and at which the schooner was docked and lying while the respondent was discharging the cargo of coal consigned to it, and brought for it from Philadelphia. The Frank W. Benedict is a three-masted schooner, of a coal-carrying capacity of 850 tons.  In August, 1903, she was chartered to the respondent to carry a cargo of coal from Philadelphia to Kittery Point, Me.  In pursuance of the charter, the schooner received on board at Philadelphia 863 tons of coal, for which the usual bills of lading were executed, which provided that the cargo should be delivered to the respondent at Cutts' wharf, Kittery Point, and should be discharged by the consignee.  The respondent is engaged in operating an electric road between Kittery Point, Me., and Portsmouth, N. H.  The wharf in question is located at Kittery Point in the town of Kittery, and was owned at the time of the injury by Joseph D. Cutts, who was then employed by the respondent to discharge its coal and deliver the same as needed. It is situated about 60 feet below the bridge, which crossed at nearly a right angle with it, and over which the respondent's track and feed wires are located.  It extends out from the shore about 150 feet, and is from 35 to 40 feet wide at its outer end, and has upon it a discharging stage. In discharging a vessel, it is necessary to bring the hatch through which the cargo is to be discharged abreast of the discharging stage.  In order for a vessel of the character of the Frank W. Benedict to discharge at this wharf from her forward hatch, it was necessary to dock her with her bow pointing up river in the direction of the respondent's bridge. In order to discharge from the after hatch, which was some 38 feet aft of the fore hatch, it was necessary to bring that hatch abreast of the stage.  This could be done either by winding the vessel, or by hauling her ahead sufficiently far so that the hatch would be abreast of the stage. If this latter course was adopted, her headgear would necessarily be over the respondent's bridge and over its track and feed wires.  The schooner arrived at Kittery Point September 9, 1903.  The next morning the master of the schooner, Capt. Look, reported to the respondent

company at its office, and was referred to its agent, Mr. Cutts, as the person who would discharge the cargo at his wharf. The agent told him to dock the schooner when the tide got up. The schooner was docked at high water, the bow heading up river towards the bridge of the respondent company, and her forward hatch abreast of the discharging stage, in accordance with the directions of Mr. Cutts, who was himself upon the wharf, and made the schooner's lines fast. The discharge of the schooner was proceeded with by the respondent, the officers of the schooner giving no directions as to the discharge. On September 14th the discharge from the forward hatch had been completed. To discharge all the cargo from the forward hatch would have involved much extra labor and expense. Just before the discharge from the fore hatch had been completed, Capt. Look and Mr. Cutts had some conversation about winding the vessel, but Mr. Cutts concluded that he could haul the schooner ahead, and save some expense, and that there was room enough to let the schooner go forward sufficiently far to bring the main hatch abreast of the discharging stage. Accordingly the lines were slacked, in order to let the tide set the schooner ahead. After the schooner had been slacked ahead about 32 feet, and within 6 feet of the distance necessary to bring the main hatch abreast of the discharging stage, it was found that there was danger of the vessel fouling the respondent's wires if she went ahead any further. Thereupon, the lines having been made fast, it was found that the schooner's jib boom extended over the respondent's bridge. Mr. Cutts found it necessary to hoist up the schooner's martingale, in order to allow her to go ahead far enough to bring the main hatch to the stage. Accordingly, the martingale was hoisted up at an angle of about 39 deg. At that time the master and mate of the schooner and Mr. Cutts had a conference upon the bridge. The tide was about two-thirds flood. They were in some doubt whether on the low water the schooner's headgear would come down on the wires. Mr. Cutts took measurements, and then stated that he did not think that the headgear and the wires would come together on low water, as there was room enough; the vessel's chains being nine feet above the wires. He further said that he would have the lineman come down the next day, and throw the wires off the arms. There is some dispute as to precisely what was said at this conference, but Mr. Cutts admits that he gave it as his opinion that contact of the schooner's chains with the feed wires would not hurt the vessel. After this conference, and after measurements had been made, the master and mate went back to their vessel, and slacked the schooner ahead six feet further; Mr. Cutts remaining upon the bridge. When the after hatch came abreast of the discharging stage, the schooner's lines were made fast. Mr. Cutts then said he thought there was no doubt but that the schooner would be all right. He then assured the captain if there was any damage it would be to the wires, and not to the schooner. He testifies that he did not think at the time that the schooner would be damaged; that his only fear was about the wires; that he was alarmed about breaking down the wires of the company, and interrupting the service; that he knew nothing of the danger of electricity, and does not claim

that he made any attempt to know anything about it. Later in the afternoon, the crew of the schooner unhooked her jib halyards, put a strap around her two jumper chains, and hoisted them up six inches further, which was as high as they could be hoisted. That night a heavy storm came on, with a strong wind, about south-southwest, blowing up river. About 11 o'clock the mate discovered that the schooner was on fire on the starboard side, near the fore chains. It was found that on the low water the schooner's stern had taken the bottom; that her bow had settled; that her jumper chains had come in contact with the respondent's feed wires; that an electric current had passed through one of the head stays to the topmast head, and then down over the back stays through a chain plate to a point on the starboard side near the exhaust pipe from the engine, with the result that the schooner's starboard side at that point was set on fire. The schooner was aground aft, and there was too much wind to attempt to haul her astern. The fire was kept under control by a stream of water from the pumps. A little later the electric current was shut off from the wires, and the superintendent of the railroad came to the libelants' schooner, and obtained a small piece of rope, one end of which he made fast to the bridge, threw the other end over the feed wires, and hauled them down some two or three feet below the schooner's chains, where they remained until the schooner completed her discharge.

1. In coming to a conclusion as to where the fault lay, the court must first consider what duty rested upon the respondent. Under the contract of carriage, the obligation of discharging the vessel was clearly upon the respondent as consignee. In fulfilling this obligation, it was incumbent upon it to designate a suitable place for the schooner to lie while discharging, and to know, as far as by reasonable effort it could ascertain, that such place was reasonably safe. As a part of its obligation in this behalf, the respondent was charged with the duty of furnishing an agent to have charge of the unloading who should have sufficient knowledge to provide a reasonably safe place for the vessel to unload. It is not necessary for the libelants to prove actual knowledge on the part of the respondent of any unfitness of the dock or of the wharf; it is sufficient that the respondent's agent had means of knowledge. For, while a consignee, upon whom is imposed the duty of discharging a vessel, does not guaranty its safety in coming to or lying at his wharf, he is bound to exercise diligence in ascertaining the condition of the dock and of the berths, and to give notice of any obstruction or of any danger to vessels. This subject has just received the attention of this court in Philadelphia & Reading Ry. Co. v. Walker, 139 Fed. 855. This court has also considered a similar question, and has cited leading authorities upon it, in Thompson v. Winslow (D. C.) 128 Fed. 73. The subject has also been fully discussed in the following cases: The Calvin P. Harris (D. C.) 33 Fed. 295; Hartford & New York Transportation Co. v. Hughes (D. C.) 125 Fed. 981; The Nellie (D. C.) 130 Fed. 213; Smith v. Burnett, 173 U. S. 430, 19 Sup. Ct. 442, 43 L. Ed. 756; Sawyer v. Oakman, Fed. Cas. No. 12,404; Garfield & Proctor Coal Co. v. Rockport & Rockland Lime Co., 184 Mass. 60, 67 N. E. 863, 61 L. R. A. 946, 100 Am. St. Rep. 543.

The contention of the respondent is that its agent, Cutts, did not know that the contact of the jumper chains with the feed wires would be dangerous, and that this ignorance furnishes a sufficient defense. The court cannot sustain this contention. I see no reason for holding that the respondent is excused for ignorance of the effects of electricity when brought in contact with the chains of a vessel, any more than for ignorance with respect to the physical effects of exposing the vessel to a strain from contact with the wires or poles. The obligation to furnish a safe dock must be held to apply to all the conditions in which the vessel is placed, and to all the danger to which she is exposed in effecting the discharge of her cargo. Courts have repeatedly held that a consignee, charged with the duty of discharging a vessel, must know, or take reasonable pains to ascertain, the peculiar construction of the wharf, the condition of the bottom of the dock, and any defects which were capable of being discovered in a landing place. There is no reason reason to hold that such consignee is relieved from the duty of such knowledge with reference to the dangers which would arise to a vessel's headgear by reason of projections or obstructions extending out from the wharf, or from dangers from contact with live electric wires. The respondent had the full charge of these wires. There was nothing occult or mysterious about the effect of electricity when carried over those wires to the chains of a ship. In my opinion, then, the respondent ought not to be heard in court to say that it was ignorant of the dangers arising from those wires, uninsulated, being brought in contact with a vessel's chains. Whatever dangers there may be from live electric wires, the party having control of those wires cannot be allowed to excuse itself on the plea of ignorance. In the case at bar the respondent might have escaped all danger from the wires by winding the schooner, and thus bringing her into a position of safety while she was unloading from her after hatch. Even if the respondent's agent did not incur the expense of turning the vessel around, he might have obviated the danger by putting a rope over the wires, and binding them down, as in fact he did later. A still more effective way of obviating the danger would have been by throwing the wires off the arm, as the agent on the day before the injury said he intended to do the next morning. I am forced to the conclusion that the respondent was in fault.

2. Were the libelants also in fault? The subject of the duty of a libelant under similar circumstances was also considered by this court in the case of The Elmwood, in Philadelphia & Reading Ry. Co. v. Walker, to which reference has already been made. The court there cited and discussed the recent cases bearing upon this subject. In the case at bar it is true that the master of the schooner did not know the danger from the electric wires, but he was not charged with the duty of such knowledge. He had a right to rely upon the direction of the company's agent to discharge at this particular wharf as an assurance that the wharf was reasonably free from dangers and obstructions. He had a right to assume either that the electric wires from the respondent's railroad would not be brought in contact with the ship's chains, or, if so brought in contact with them, that they would not cause damage. In addition to the

assurance which at law the respondent company is assumed to have made by inviting the Benedict to its wharf, the actual assurance made by the respondent's agent tended rather to mislead the master than to put him upon his guard. Mr. Cutts shows clearly a disposition to tell the whole truth in the matter, and admits frankly all statements which he made touching the affair. He says he told the captain: "No harm will come to the vessel anyway; you will get no damage; the damage will be, if you ground on those wires, you will break them down; we will get the damage, that is all." The agent was thinking, as he says, of the dangers to the wires, and not of any dangers which the vessel might encounter. After the assurances of Mr. Cutts, the captain used language indicating that he would take his chances; but those utterances of the captain cannot, in law or in fact, be held to be a waiver of his rights to look to the respondent company for a reasonably safe place of discharge, for the captain was evidently relying upon the assurances of the respondent's agent. He cannot be held to have assumed the risk of damages, the existence of which he did not know. The captain and the agent were both ignorant; but it was the duty of the agent to know the dangers to which he was exposing the vessel. They were dangers within his control; they were dangers that lurked in apparatus and appliances which were vital in the work which his company was doing. The captain, however, was under no such obligation to know the dangers from electric wires. He had a right to assume that the invitation of the respondent company to his vessel to come to a proper place of discharge was an assurance of safety, and he had a right to assume that the special assurances of the agent were made with a due knowledge of the premises. The Stroma (D. C.) 42 Fed. 922, and Panama R. Co. v. Napier Shipping Co., 166 U. S. 280, 17 Sup. Ct. 572, 41 L. Ed. 1004, are cited by the learned counsel for the respondent as controlling in this case; but in those cases both parties had knowledge of all the dangers to which the vessel was exposed, and from which she actually suffered injury. In the case at bar, neither the master of the schooner nor the agent of the respondent had any knowledge whatever of the danger which caused the injury. They were both ignorant. The matter of electricity was not referred to by either. This danger was not in the minds of either. The injury did not result from any cause which was in the contemplation of either the master or the agent. The injury resulted from another and totally different cause, of which both parties were ignorant, but concerning which it was the duty of the respondent to know, while it was not incumbent upon the captain to know. I must then come to the conclusion that the libelants were not in fault. I am therefore of the opinion that the respondent was solely in fault.

The libelants are therefore entitled to a decree in their favor. Reference may be had to an assessor.