### VERDON v. BROOKLYN HEIGHTS R. CO.

(District Court, E. D. New York. December 5, 1907.)

1. WHARVES—INJURY OF VESSEL—OBSTRUCTION IN SLIP.

A railroad company, which leased a wharf and required its use constantly by vessels for delivery of goods, was under the duty of knowing the character of the slips used and whether obstructions existed which would endanger a vessel assigned by it to a berth therefor unloading.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 48, Wharves, § 42.]

157 F.—31

2. SAME.
> The sinking of a vessel by reason of a hole broken through the bottom while she lay at a wharf *held*, on the evidence, to have been caused by an obstruction some distance beneath the surface of the water in the slip, upon which the vessel settled with the falling tide, and for which the lessee of the wharf was responsible.

In Admiralty.

Alexander & Ash, for libelant.

Clarke Day (A. M. Williams, of counsel), for respondent.

CHATFIELD, District Judge. The Brooklyn Heights Railroad Company is the lessee of a dock in South Brooklyn, extending some 400 feet westward into New York Bay; the slip upon the south side of the dock having a depth of 20 feet at the outer end, and shelving up to a mud bank at the head of the slip. The tide rises 5 or 6 feet in this locality. On Friday, the 29th of September, 1905, the Earl Hawley, a canal boat owned by the libelant, with a cargo of granite paving stones from Connecticut, in tow of a steam canal boat, the Arthur Bissell, reached the head of this slip, and after a few moments' delay entered the slip and was tied up outside of a scow containing gravel and sand, which was next to the pier in question. On Saturday, September 30th, the Hawley was moved up and fastened with a bow, stern, and spring line to the south side of this pier; the bow of the Hawley pointing out, and being on a line with the head of the pier. The Hawley was a square-bowed canal boat, drawing 8½ feet of water when loaded, and with no curve or rounding at the bilges. The bottom planking was 2 inches in thickness, and the cargo rested upon a sheathing or false bottom, with some 9 inches space between the bottom planks and this sheathing.

The captain of the Hawley was in charge until Saturday afternoon, and from then on until Monday morning the engineer of the Bissell was in charge of both boats. The engineer testifies that on Sunday he was fishing, but that he pumped the water from the Bissell every 6 or 8 hours, and the captain and the engineer of the Hawley agree that she did not leak, had been thoroughly overhauled a year previous, and had been tight from that time. She had encountered no rough weather, and, while some of the witnesses for the respondent testify that when the Hawley reached the dock the steam siphon pump was going, it is considered that the pumping which was done was on the Bissell and not on the Hawley. About 4 o'clock on Sunday afternoon the engineer found about 3 inches of water in the Hawley, and by 5 o'clock observed that she had settled so that her deck was below that of the Bissell. He then found 3 feet of water, and, inserting the steam siphon, attempted to pump out the boat, but in less than half an hour the water gained 15 inches while he was pumping. Some boys, and later some 6 or 8 men, attempted to pull the Hawley along the face of the dock by lines, and the engineer testifies that, the boat not coming, he connected a breast line to the Bissell and backed his engine, when the Hawley came away with a jerk, and the men then pulled her along to the end of the slip upon the mud. Lines were carried from her to the dock; but, as the tide rose, she slid out about

100 feet into deeper water, the lines breaking, and finally rested so that she was under water at low tide, with the exception of a portion of her coaming.

One James corroborated the testimony of the engineer, and also corroborated the testimony of the captain that on the morning of Monday, the day following, the captain located at a point 16 feet from the end of the pier, and about 18 inches off from its face, an object about 18 inches high, resting in the mud, and about 7 feet below the surface of the water, which was then rising after the turn of the tide. On the following day, Tuesday, the Hawley was hauled out of the water, and on the 5th put in the dry dock. A hole was then found in her bottom 16 feet from the bow, and 16 inches from the edge which had been lying next to the dock. The owner of the dry dock testifies that this hole was about 8x10 inches, and that there were no scratches or injuries around the hole upon the bottom of the boat. The captain also testifies that the sheathing was broken or pushed up immediately over this hole. This testimony is more persuasive than that of the witnesses for the respondent, whose recollection was that the hole was 2 inches wide by 8 inches long.

The witness Cassidy testifies that he saw the Hawley sinking at about 2 o'clock on Sunday afternoon, and called the attention of other people to her; that she was then about 8 inches out of water; and that he offered his assistance at about 5 o'clock in the afternoon, when, after having continued to go down, she was still 8 inches out of water. His recollection is that the Bissell did not have steam up, and that the Hawley was moved entirely by the efforts of the men. But it is not considered that these discrepancies in the testimony seriously affect the determination of the main question, which is when the Hawley received the injury which sank her, and what was its cause?

Low tide on Sunday afternoon occurred about 3:30 o'clock. The night watchman and the storekeeper indicate that the accident may have happened somewhat later than the time fixed by the engineer, Hazen, and by Cassidy, the witness called by the respondent. But the only effect of this would be to have given the tide more time to rise, and it does not materially affect the issue.

At some time after the captain had made the mark upon the dock opposite which he claimed to have located the obstruction, he called the attention of Tilden, the general foreman at this dock for the respondent, to a pile, which the captain tried to show this witness, but which the witness could not see. Tilden testifies that he felt some rocks, a pile of stone 12 or 13 feet high and 7 to 8 feet under water, under the dock cribwork construction in connection with the pier, and that the water at the face of the dock was 20 feet deep at high tide, and at low tide it was 15 feet. This witness also testifies that he saw a steam siphon running through the deck of the Hawley, and that they were pumping on the Hawley continuously during the afternoon of Saturday.

Upon the review of the testimony above set forth, and upon the facts herein recited, it is necessary to consider three questions: (1) Whether the obstruction claimed by the libelant existed; (2) whether the damage to the Hawley was caused by this obstruction; and

(3) whether any negligence upon the part of the respondent is shown, so as to place upon the respondent the responsibility for the damage. The case of Crossan v. Wood (D. C.) 44 Fed. 94, defines the principles involved in relation to the first two points. In that case Judge Brown says:

"The primary fact of the existence of the obstructions alleged, and that the damage arose from that cause," must be clearly proved.

In the present case, upon the testimony as it appears to the court, the libelant alleges a peculiar injury to the bottom of the vessel, which injury extended to the sheathing some 9 inches above the bottom. This injury, in the form of a nearly square puncture, must have been caused by some object protruding through the bottom of the vessel in an almost vertical direction. The depth of the water, the length of the pile found by the master of the vessel, its size, and the condition of the tide, all correspond; and if the pile in question punctured the bottom of the vessel at low tide, upon the afternoon of Sunday, October 1st, the floating of the vessel as the tide rose would lift the boat clear of the pile, and at the same time allow the water to rush into the openings in such a manner as to cause sinking within a very short period.

The accident occurred in the neighborhood of 5 or 6 o'clock, and flood tide, as shown by the tables, was in the neighborhood of 9 o'clock that evening. The attempt to move the vessel by hand, which failed, and the subsequent pulling of the boat clear of the obstruction by means of the steam canal boat, would indicate that the boat was raised by the tide faster than it sank from the filling with water, and is the only reasonable explanation of the testimony. No evidence is offered and no explanation given as to how the injury could have been received in any other manner. The puncture could not have been made while the boat was sliding back into deep water, for not only would the character of the injury be materially different, but also the boat had sunk at the end of the dock before this sliding. It follows that the injury must have existed prior to this time, as no other cause of sinking is shown. The obligation was upon the respondent to furnish a safe place to all vessels using this wharf. Smith v. Havemeyer (C. C.) 36 Fed. 927; O'Rourke v. Peck (C. C.) 40 Fed. 907; Hartford & N. Y. Transportation Co. v. Hughes (D. C.) 125 Fed. 981.

The respondent in this case was the lessee of the wharf, in possession and using it for its purposes at the time. The libelant's boat was brought to the wharf and given a berth, under the direction of the respondent, in order to deliver goods to the respondent, and the duty of providing a safe place was therefore upon the respondent. As was said in Wendell v. Baxter, 12 Gray (Mass.) 494, the respondent would not be liable for a latent defect "so hidden and concealed that it could not be discovered by such examination and inspection as the condition, use, and exposures of the wharf reasonably required." But in a case like the present, where the respondent was in charge of the wharf, using it for the delivery of goods constantly, and requiring different vessels to be continually brought to the wharf for its own

purposes, the duty would seem to rest upon the respondent of knowing the character of the slip, whether obstructions existed, and whether there was water sufficient to accommodate a boat of the character assigned to the berth for unloading. It would be impossible and unreasonable to expect from every boat an examination (which could properly be made only by a diver) of the bottom of the slip before bringing the vessel up to the dock, and no evidence whatever has been offered in the case to show that the respondent had made any examination whatever, or had any knowledge of the conditions prevailing in front of its wharf, except such as had been gained from the experience of other vessels which had used the wharf previously and had not been injured.

The libelant's boat, being a canal boat with square ends and bilge lines, would need different accommodations than a round-bottomed vessel, and even the fact that a boat containing crushed stone and drawing 10½ feet of water had previously used the slip without injury does not free the respondent from responsibility, unless it were shown that the conditions of the tide had been exactly similar, and that the vessel previously occupying the slip had been brought as close to the wharf as the libelant's vessel would and did go. Further than this, the testimony offered by the respondent, while inconsistent and vague in many places, was to the effect that the pier, some 400 feet in length, had been built in cribwork out into water 20 feet deep, and that the mud bottom which the captain of the libelant's vessel testified he found at a depth of about 8½ feet, shortly after the tide had begun to rise on the morning of October 2d, did not exist. The respondent, being in the possession of the dock and the slip, had plenty of opportunity to furnish convincing proof of the size and depth of the slip and of the conditions of water existing at this point, and could have obtained plenty of corroborative testimony to the statement that no obstruction existed at the time of the accident, if such had been the case.

In the absence of any attempt on its part to furnish any evidence beyond that of the dock superintendent, whose testimony is so unsatisfactory, it must be concluded that the respondent had nothing further to offer which would have been in its favor. It seems, therefore, that the allegations of negligence on the part of the respondent are sustained, and that the injuries resulted from an obstruction for the presence of which the respondent must be held responsible.

The libelant may have a decree accordingly.