STERNS LUMBER CO. v. JOHN H. RICE CO. et al.

(District Court, D. Maine, N. D.    September 6, 1919.)

No. 8.

1. SHIPPING ☞54—CHARTERER LIABLE FOR DOCKING SHIP IN UNSAFE BERTH.
    The charterer of a schooner, which was to discharge her cargo of coal at its own dock, and which designated the berth where she was to lie overnight before unloading, *held* liable for her injury by settling at low tide on a dangerously uneven bottom, by which she was broken and strained.

2. SHIPPING ☞54—SHIP DOCKED BY CHARTERER IN UNSAFE BERTH DID NOT ASSUME RISK.
    The fact that the master of a schooner had once before discharged her at the wharf where she was directed by the charterer to lie overnight before unloading, and where she was injured by settling on an uneven bottom, *held* not to charge her with assumption of the risk, where on the former occasion she was largely unloaded before the fall of the tide.

3. CORPORATIONS ☞306—OFFICER OF CORPORATION CHARTERER NOT PERSONALLY LIABLE FOR INJURIES TO SHIP.
    Where the president and general manager of a corporation which was the charterer of a vessel acted for the corporation and within his powers in directing the vessel to a berth, where she was injured by reason of the insufficient depth of water, he is not personally liable for the injury.

In Admiralty. Suit by the Sterns Lumber Company, owner of the schooner Florence and Lillian, against the John H. Rice Company and John H. Rice. Decree for libelant against the John H. Rice Company, and dismissed as to John H. Rice.

Nathan W. Thompson and George C. Wheeler, both of Portland, Me., for libelant.

Fellows & Fellows, of Bangor, Me., for libellees.

HALE, District Judge.    This libel is brought in behalf of the schooner Florence and Lillian, to recover damages sustained by the schooner in September, 1917, while discharging a cargo of coal at the dock of the respondent company at Bangor. The libel was amended, joining John H. Rice as a respondent.

The schooner is a three-masted vessel, of the burden of 250 tons, and a coal-carrying capacity of 400 tons. At the time of the injury

she was in command of Nelson A. Crocker, a part owner. In August, 1917, she was chartered, under an oral charter, to the respondent company to load coal at Port Reading, N. J., to be carried to the respondent's wharf at Bangor. The terms of the charter were agreed upon by the libelant, the agent for the schooner, and by the company, the charterer, as appears by the bill of lading.

The schooner arrived, with her cargo, at the mouth of the Penobscot river early Sunday morning, September 2, 1917. By means of the lighthouse keeper, Capt. Crocker reported to the charterer by telephone, and was told by John H. Rice, in behalf of the company, to "come right up; the dock is all right." The vessel was towed up the river, and reached Bangor early in the afternoon of Monday, Labor Day, September 3, 1917. After the schooner anchored, Capt. Crocker talked with Wilbur Reed, the head stevedore of the Rice Company, who was standing on the wharf. In reply to the question whether it was all right to come in, Reed said it was, and added: "If the tug don't come after you, why, it will be all right to lay there until morning." While the schooner was being towed in, John H. Rice, the president of the Rice Company, came down and had some conversation with Capt. Crocker. Reed also engaged in the conversation. Capt. Baldwin, of the tug which had the schooner in charge, says he feared that there might not be water enough and said to Rice: "How much water have you got here at low tide?" Rice replied: "Twelve or 13 feet." Capt. Baldwin then called Rice's attention to the low run of tides, and said: "You must have dug it out." Rice said: "Yes." Capt. Baldwin said: "It must be all right now, then?" To which it appears that Rice assented.

It appears from the proofs that Rice was there when Reed took the docking lines of the schooner, and that Rice determined when the after hatch was under the staging. The wharf extends out into the river about 60 feet, and up and down the river about 62 feet. Vessels assigned to this wharf with cargo belonging to the company were discharged by Reed, who appears to have had full control of discharging all vessels for the company.

The schooner was docked at the end of the wharf under the circumstances which I have outlined. That night she filled and sank. The libelant says that her damage occurred as a result of the condition of the bottom, which the respondents knew, or ought to have known. This libel is brought to recover expenses in repair of this schooner, and for the loss arising from her detention in order to make necessary repairs, and also because of permanent damages to her by stranding.

The respondent company denies that the schooner was staunch, strong, and fitted for the work she was engaged in, and says that the dock at which she came to anchor was a suitable, convenient, and proper berth for a vessel of her size, and that the damage to her was occasioned by her own unsuitable condition and negligent management; that the injury occurred by reason of the libelant's fault; that Capt. Crocker was fully acquainted with the dock, had been there before, and knew its condition; and that the damages resulted from no fault of the respondent.

1. The proofs show that the schooner was an old vessel, but that she had been overhauled and recaulked at Camden, just before the injury; that, during the voyage to Bangor, she had required pumping only once in three days with the gasoline pump forward, which appears by the testimony to have been in good condition; that, two months previous to the injury, she had carried a cargo of coal to the same respondent, and that no complaint was made as to her condition; that her crew were all Maine men, of experience in the class of work in which they were engaged. From the testimony I must conclude that the schooner was in a staunch and seaworthy condition at the time of her docking.

2. On the question of the condition of the dock, the principal direct testimony in behalf of the libelant is given by Percy H. Richardson, a civil engineer of experience. He put in evidence a cross-section plan of his soundings, which shows the unevenness of the bottom at the place where the schooner lay. He testifies that the dock had a hard gravel bottom, with many cobble stones in it, and one boulder about a foot in diameter; that at the lower end, near where the stern of the vessel would come, there were 7.8 feet of water; that at the bow of the vessel there were 8.5 feet, and amidships 10.9 feet; and that it would be necessary for the keel of the vessel to settle 3 feet and $7\frac{1}{4}$ inches to have the entire keel of the vessel rest on the bottom.

The proofs show that the schooner grounded at her bow and stern and sagged amidships; that as a result of the straining the foremast raked aft and the mizzenmast raked forward; that cracking was heard near the mainmast by those on board. It appears that other vessels had docked there without apparent injury, but that such vessels had been discharged before they had time to ground, or that they had been towed off into the stream. It does not appear, from the testimony, that a vessel of the size and draught of this schooner had lain there and grounded out with a whole cargo on board.

Reed, the stevedore, says that he had full control of all vessels discharging, and that he did not have to ask whether he should discharge or not. Capt. Crocker testifies that Reed told him it would be all right to come into the wharf, if he wanted to lie there, and reminded him that he had been there before.

The evidence convinces me that at the point indicated on Richardson's cross-section plan the dock was uneven, the schooner grounded upon this uneven bottom, and her straining was occasioned by such grounding. The testimony shows that the agent of the respondent designated the place where the schooner was to lie.

It was clearly the duty of the respondent company to exercise reasonable care in ascertaining the condition of the dock thus designated. It was not a guarantor as to the condition of the dock, but was bound to the exercise of reasonable care in ascertaining its condition before assigning it for the discharge of a vessel. Its want of knowledge cannot relieve it of responsibility, if the defects were readily discernible by the exercise of reasonable care. In Look v. Portsmouth, Kittery & York Street Railway Co. (D. C.) 141 Fed. 182, this court dealt with a question similar to that arising in the case at bar. The

court held that it was incumbent upon a consignee, charged with the duty of discharging a vessel, to designate a suitable place for her to lie while discharging, and to know, as far as by reasonable effort it could know, that the place was reasonably safe; that it was a part of the obligation of the consignee to furnish an agent to have charge of the unloading who should have sufficient knowledge to provide a reasonably safe place; that it was not necessary for the libelant to prove actual knowledge on the part of the respondent, or his agent, of any unfitness of the dock, but that it was sufficient that the respondent's agent had means of such knowledge; that the agent was bound to know the condition of the dock, and not to permit vessels to enter unless the dock was reasonably safe. Philadelphia & Reading Ry. Co. v. Walker (D. C.) 139 Fed. 855; Merritt v. Sprague (D. C.) 191 Fed. 627; Docks v. Gibbs, 11 House of Lords Cases, 512; Hartford, etc., Transportation Co. v. Hughes (D. C.) 125 Fed. 981; Smith v. Burnett, 173 U. S. 430, 19 Sup. Ct. 442, 43 L. Ed. 756; Smith v. Havemeyer (D. C.) 32 Fed. 844.

In the case at bar the evidence discloses that the principal examination of the dock made by the respondent was that of a bookkeeper who went down to see if there were any logs or foreign substances on its bottom, but who had no such experience as would enable him to determine its fitness for the docking of a large vessel. It is not shown precisely upon what the president and agent of the company relied, when he stated that the wharf had been dredged and that there were 12 or 13 feet of water at low tide.

Capt. Crocker had formerly lain at the wharf and knew something of it; and this is an important consideration. The case would undoubtedly be much stronger for the libelant if Capt. Crocker had never been at this dock before. Thompson v. Winslow (D. C.) 128 Fed. 84; Philadelphia Railway Co. v. Walker (D. C.) 139 Fed. 855; Union Ice Co. v. Crowell, 55 Fed. 87, 5 C. C. A. 49; Merritt v. Sprague (D. C.) 191 Fed. 627. But Capt. Crocker did not know from former experience the dangers to which he was subjected in allowing his schooner to be stranded upon this bottom before discharging any of her coal. He had been at the wharf once before, but at that time he arrived on high water, and 150 tons of his cargo were discharged before the tide had fallen, so that the vessel did not ground, and he had no occasion for sounding. With this imperfect knowledge, he had the assurance from the respondent's agent that the dock had been dredged, and that there were 12 or 13 feet of water. The attention of the respondent's agent seems to have been called to the extreme tides which were running that day, and I cannot escape the conclusion that, if he had made an effort to sound the dock, he would have discovered that it was unsafe to allow this large vessel, with her full cargo, to be grounded at the point designated for her discharge. After the grounding, when the schooner was hauled out, it was found that she was badly strained; her butts had opened; the oakum had started. After the vessel was docked, snapping sounds were heard near the mainmast. Soundings were made, the vessel was found to be leaking badly, and the pumps were started. Report was made to Capt. Crocker; when he arrived

at the schooner, he noticed that the foremast was raking aft, and the mizzenmast raking forward, which made it evident that the keel, amidships, had gone down—that her "back had broken." Soundings were made, and it was found that the water was as deep in the hold of the schooner as it was outside—that the water was running through her. When the tide came up, the schooner did not lift. Before the cargo was discharged, it was found necessary to discharge some coal and to get the wrecking pump on a scow to assist her own pump. Before docking, the testimony shows that the schooner had needed to be pumped only five or six strokes every third day. After the injury, it required her own pumps and the wrecking pump to keep her free, even after the discharge of the cargo. From the whole testimony, I am convinced that her injuries arose from the fact of the grounding, and that such grounding might have been prevented by the exercise of reasonable care on the part of the respondent corporation.

[1, 2] 3. The respondent charges fault on the part of the libelant, and says that Capt. Crocker knew the condition of the dock when he came to it, and that he assumed all risk of injury arising from its condition. As has been said, Capt. Crocker had been at the wharf once before. I have already referred to the testimony showing that on that occasion he arrived at high water, that 150 tons of his cargo were discharged before the tide had fallen, and that, under these circumstances, his schooner did not ground, and he had no occasion for sounding. The testimony indicates that the respondent's agent had knowledge of the condition under which the schooner had discharged at the wharf on the former occasion. When we consider what, in fact, the agent of the respondent told Capt. Crocker, I think it clear that the captain had a right to assume that the water in the dock was sufficient for the schooner to lie there in safety at the time in question, and that, if there were any special dangers to which the schooner might be exposed, on account of the running of the tides, or for any other reason, he should have been fully informed. He was not informed. He says he was told, on the other hand, that the dock had been dredged, and that there were 12 or 13 feet at low water. The proofs show that the agent of the respondent, who undertook to act in the premises, had himself no such information as he ought to have had under all the circumstances of the case.

It seems clear to me that the respondent company has not met the burden of showing that there was any waiver on the part of the libelant, or that the libelant was guilty of contributory negligence, or of any fault.

[3] 4. By the amended libel it is contended on the part of the libelant that John H. Rice, the president and general manager of the respondent company, is personally liable for the injury. It appears that John H. Rice was the managing head of the respondent corporation; that at the time of the injury he owned all its stock, with the exception of 2 shares. His interests and the interests of the corporation were closely connected. He cannot, however, be held personally liable for damages, unless it is shown affirmatively that the injury resulted from his mismanagement, misconduct, or negligence.

The libelant charges that it was the duty of Rice, both individually and as a representative of the company, to notify Capt. Crocker, on September 3, 1917, that the berth at the wharf in question was not suitable for the schooner to dock; that Rice purposely refrained from giving such warning by reason of his anxiety to obtain the schooner's cargo of coal as soon as possible; that his testimony shows that he felt personally responsible regarding the vessel's docking, whereas he says that he knew nothing about the extreme tides and made no efforts to find out in regard to them. Rice admits that Reed was his agent; that he heard Reed tell Capt. Crocker that there were 12 or 13 feet of water there. Capt. Baldwin testifies that, when they got into the dock, he asked Rice how much water there was, and he said 12 or 13 feet; that the captain then said, "You must have dug it out?" To which Rice replied, "Yes." Capt. Baldwin added, "It must be all right now, then?" Rice replied, "Yes."

The testimony is clearly sufficient upon which to base the conclusion that Rice bound the corporation by what he said and did. The corporation and the libelant were the parties to the contract, for the terms of the bill of lading were the terms under which the coal was carried. The ship, then, was dealing with the corporation. Rice was representing the corporation in his declarations.

The testimony is not sufficient to persuade me that Rice committed an ultra vires act. His actions did not result in the corporation doing any act beyond its powers. As agent, he did nothing beyond the power of an agent. The libelant has not, in my opinion, met the burden of showing that Rice was guilty of such mismanagement, misconduct, or negligence as to make himself personally liable to the libelant in damages. Cook on Corporations (7th Ed.) § 682, and cases cited.

My conclusion is: As to John H. Rice, the libel is dismissed, but without costs. The John H. Rice Company is to answer in damages for the injury to the schooner and for her detention.

A decree may therefore be entered for the libelant against John H. Rice Company, with an order of reference to assess damages. Fritz H. Jordan, Esq., is appointed assessor. The libelant recovers costs against the John H. Rice Company.