TWO HUNDRED AND SEVENTY-EIGHT BARRELS OF DISTILLED SPIRITS (UNITED STATES v.). See Cases Nos. 16,580 and 16,581.

TWO HUNDRED AND SEVENTY-FIVE CADDIES OF TOBACCO (UNITED STATES ex rel. AMES v.). See Case No. 15,881.

TWO HUNDRED AND SIX BARRELS (UNITED STATES v.). See Case No. 16,-582.

---

## Case No. 14,295.

### TWO HUNDRED AND SIXTY-EIGHT LOGS OF CEDAR.

[2 Lowell, 378.] [1]

District Court, D. Massachusetts. Dec., 1874.

DEMURRAGE—NOTICE—BURDEN OF PROOF.

1. If part of a cargo is discharged at one wharf and part at another, the owners of the vessel not objecting, the time necessary for moving the vessel is not chargeable to the charterers.

[Cited in Carsanego v. Wheeler, 16 Fed. 254.]

2. A formal notice to the consignees that a vessel is ready to receive cargo is not necessary if they knew that she was ready.

3. That they did know it may be inferred from circumstances, so far as to throw the burden of proof on them to show the contrary.

Libel for freight and demurrage under a charter-party, by which the brig John Airles was let to hire to J. Van Praag & Co., of Boston, for a voyage to Surinam and back to Boston. At the trial it was admitted that the balance due for freight was $922.85, and the dispute was, whether any and what sum was due for demurrage. The master had died on the homeward voyage, and the mate testified to a considerable delay at Surinam beyond the time allowed by the charter-party, but could not explain its causes beyond what was taken up in repairing the ship, which, being deducted, left more than a week to be accounted for. There was conflicting evidence concerning the conduct of the parties on the arrival of the vessel at Boston. The contract provided for twenty-five running days, for discharging and loading again at Surinam, and despatch in unloading at Boston, "commencing from the time the captain reports himself ready to receive or discharge cargo."

J. C. Dodge, for libellants.

S. J. Thomas, for claimants.

LOWELL, District Judge. The evidence proves that part of the homeward cargo was discharged at one wharf and part at another; and no objection appears to have been made by the owners of the brig to this mode of unloading, and I assume it to have been proper and according to the usages of the trade. The time needed for moving the brig would not be chargeable to the charterers under these circumstances. The Mary

[1] [Reported by Hon. John Lowell, LL. D., District Judge, and here reprinted by permission.]

E. Taber [Case No. 9,209]. But it is proved that the charterers neglected for two or three days after the first part of the cargo was taken out to name the place at which the remainder was to be delivered; and for this time they must pay.

The more difficult question of fact is, whether they are responsible for ten days at Surinam, or only for two days. Twenty-seven days were actually taken in unloading and loading at that port, so that two days are clearly due; but whether the remaining eight are so is the difficult point. Those days were lost after the vessel was repaired and ready, and before the first log of cedar was brought alongside; and the point is, whether the master notified his readiness to load. This is a simple question of a presumption of fact; but I have found it none the less a difficult one, the master being dead, and the mate having no knowledge upon this matter.

I do not understand that any formal notice need be given, if the brig was ready, and the consignees knew it. The master's notice would not bring on the lay days if the ship was not ready, and his failure to notify in form would not put them off, if the other party was fully informed of the ship's being ready. The notice is provided for mainly to exclude the notion that the mere arrival of the vessel in port shall cause the lay days to begin to run.

Now, it is proved that, after the repairs were made, the brig was hauled into the stream within sight of the consignee's place of business, which was not more than two hundred and fifty yards away. It is further proved that after the loading was actually begun there was delay, and an evident deficiency in the men and means employed by the charterers. From the former circumstance, and from the constant intercourse that always takes place between the master and his consignees in a foreign port, especially when the vessel has just been discharged by the same consignees, and that the consignees advanced more money than the charter called for, which must undoubtedly have been to pay for the repairs, and from the fact that it was the manifest duty and interest of the master to give the notice, if necessary, I think common sense requires me to infer that the information was given to the charterers, or acquired by them in some mode. The probability that the delay may have been caused by some want of preparation on the consignees' part is strengthened by the fact that there was afterwards actual and undoubted delay and difficulty from that cause. And although the plaintiff can never succeed upon the mere weakness of the defendants' case, yet, if the burden of proof is once sustained, it is to be observed that the answer accounts for the delay only by the repairing of the ship, which does not fully account for it; and that no evidence has been given in on the claimants' part, though

the case was delayed a long time, in order to take depositions at Surinam; and that there was no suggestion in any of the conversations or correspondence, so far as appears, that the consignees had failed to receive notice that the brig was ready to receive cargo after her repairs were completed.

The original charter-party stipulates that the demurrage shall be at the rate of thirty silver dollars a day. The notarial copies furnished the parties both vary from this: one says, "Thirty Spanish milled dollars," and the other "Thirty dollars," "Spanish milled" being erased. Of course the original must govern the assessment, and the premium for silver must be added. Decree accordingly.