## REED v. WELD and others.

*(District Court, D. Massachusetts.    ——, 1881.)*

1. DEMURRAGE—SUSPENSION OF VOYAGE.

   It is not to be supposed, upon libel for demurrage, in the absence of an express agreement, that a master intended or was expected to suspend his voyage, and wait an indefinite period of time before proceeding to complete it, while the consignees were engaged in finding a purchaser for the cargo.

2. SAME—LAY DAYS—STIPULATION AS TO TIME AND PLACE.

   When parties stipulate that lay days shall count from a certain time, at a certain place, and another place is afterwards substituted, the term, as to time, applies to the substituted place, there being no agreement to the contrary.—[ED.

In Admiralty.  Libel for Demurrage.

*Hale, Walcott & Perkins*, for libellant.

*E. B. Callender*, for respondents.

NELSON, D. J.  This is a libel for demurrage.  The libellant is the master of the schooner Mary H. Stockham, and on the eighteenth of March, 1879, received on board his vessel at Elizabethport, N. J., a cargo of 376 tons of coal, consigned to the respondents at Boston.  By the terms of the bill of lading the master undertook to deliver the coal to the respondents or their assigns, "above three bridges, South End, Boston, they paying freight for the same at the rate of $1.50 per ton, and 3 cents per ton bridge money, *demurrage as per new bill of lading.*"  The demurrage clause, in what is known in the coal trade as the new bill of lading, is as follows:  "And 24 hours after the arrival at the above-named port, and notice thereof to the consignee named, there shall be allowed for receiving said cargo at the rate of one day, Sundays and legal

holidays excepted, for every 100 tons thereof; after which the cargo, consignee, or assignee shall pay demurrage at the rate of eight cents per ton a day, Sundays and legal holidays not excepted, upon the full amount of cargo, as per this bill of lading, for each and every day's detention, and *pro rata* for parts and portions of a day beyond the days above specified, until the cargo is fully discharged, which freight and demurrage shall constitute a lien upon said cargo."

The vessel arrived at Boston, below the bridges, during the night of Monday, March 24th. On Tuesday morning, as she was about to proceed through the first bridge to the South End, she was stopped by an order from the respondents to report to them before going through the bridges. After receiving this order the libellant went ashore, and called on the respondents at their place of business, and was then told that their wharf at the South End, above three bridges, was full, and he would have to wait before discharging his cargo until they could sell the coal. The respondents at that time noted upon the master's copy of the bill of lading the arrival of the vessel, as follows: "Captain reported March 25th, 7:30 A. M.," that being the time of the arrival of the vessel at the lower bridge. On the following day, Wednesday, the respondents sold the coal, and after some negotiations with the libellant it was agreed that he should deliver the coal to the purchaser at Warren's wharf, above seven bridges, at the North End, the respondents agreeing to pay an additional rate of three cents a ton for each of the seven bridges. On the same day the libellant proceeded with his vessel to Warren's wharf, arriving in the evening at about 9. Another vessel was then unloading at the wharf, and it was not until the afternoon of Friday that he finally got in and commenced discharging, and he finished on the following Monday, March 31st, at 11 A. M., using due dispatch. During the negotiations nothing was said by either party as to demurrage.

I cannot assent to the view taken by the respondents, that by this arrangement the parties substituted the point above seven bridges, at the North End, as the termination of the

voyage, in place of that fixed by the bill of lading. I am of the opinion that the effect of the transaction was to terminate the voyage below the bridges. This is shown by the indorsement by the respondents on the master's bill of lading of the arrival of the vessel on the 25th, at 7:30 A. M., as well as by all the circumstances of the case. It is not to be supposed, in the absence of an express agreement, that the master intended or was expected to suspend his voyage, and wait an indefinite period of time before proceeding to complete it, while the respondents were engaged in finding a purchaser 'for the cargo. The libellant had the undoubted right to complete the voyage, and, if detained after his arrival beyond the stipulated lay-days, to rely upon his demurrage contract for compensation. When parties stipulate that lay-days shall count from a certain time, at a certain place, and another place is afterwards substituted, the term, as to time, applies to the substituted place, there being no agreement to the contrary. Macl. on Ship. (2d Ed.) 493. The lay-days began to run Tuesday, March 25th, at 7:30 A. M., and expired Monday, March 31st, at 1:30 A. M. This leaves an interval from the expiration of the lay-days to the time when the discharge was completed, 11 A. M., of nine and one-half hours. By the rule provided in the bill of lading, the demurrage for this detention amounts to $7.74, and this sum the libellant is entitled to recover.

Decree accordingly.