JOHN W. KENYON *et al. vs.* JOSHUA C. TUCKER, JUN.

In the so-called "New Bill of Lading," "arrival" means coming to the place, whether indicated by custom, or by the consignee, or by the bill of lading itself, at which the master may report his vessel as ready to unload, and may call on the consignee to provide a place for delivery.

In case of a cargo destined to Narragansett Pier, where there is only berth room for one

vessel at a time, Dutch Island Harbor is such place for vessels coming in at night or by day when the berth at Narragansett Pier is occupied.

A bill of lading contained the clause " New B/L."

*Held*, that this expression made the terms of the " New Bill of Lading," so called, a part of the contract, and that evidence was properly admitted to show what these terms were.

DEFENDANT'S petition for a new trial.

*Providence*, *October* 24, 1891. DOUGLAS, J. This is a petition for a new trial on the ground of alleged erroneous instructions to the jury in the trial of the cause.

The action is *assumpsit* upon a bill of lading whereby the plaintiffs acknowledge the receipt on board the schooner John Stockham, then lying at Port Johnson, N. J., of two hundred and twenty tons of coal, and promise to deliver the same at the port of Narragansett Pier, to the defendant or his assigns, " he or they paying freight for the same at the rate of one dollar per ton and dis. New B/L."

Evidence was admitted at the trial to show that the expression " New B/L." meant a certain form of bill of lading, commonly known as the New Bill of Lading, which contains a clause as follows: " And twenty-four hours after the arrival at the above-named port, and notice thereof to the consignee named, there shall be allowed for receiving said cargo at the rate of one day, Sundays and legal holidays excepted, for every hundred tons thereof, after which the cargo, consignee, or assignee shall pay demurrage at the rate of eight cents per ton per day, Sundays and legal holidays not excepted, upon the full amount of cargo as per this bill of lading for each and every day's detention, and *pro ratâ* for parts and portions of a day beyond the days above specified, until the cargo is fully discharged, which freight and demurrage shall constitute a lien upon said cargo."

Exception was taken to the admission of this evidence, but was not insisted upon at the argument of this petition. We have no doubt that this evidence was properly admitted, and that the contracted expression in the bill of lading had the effect of incorporating the provision with regard to demurrage into the contract of affreightment, and that the consignee is bound by it as if it had been fully written or printed in the bill of lading which he received.

The main question in the case arises upon the construction of the word "arrival" as indicating the time from which the lay days, or days allowed for the discharge without payment of demurrage, should be reckoned, and consequently when, after the lay days, demurrage should commence.

The John Stockham arrived off Narragansett Pier with this cargo at about 10 o'clock at night, December 23, 1889, proceeded to a point inside the west passage of Narragansett Bay, near South Ferry or Dutch Island Harbor, and anchored, and the master reported her arrival to the consignee by telephone at 7.20 o'clock A. M., December 24. At that time there was no berth vacant at the wharf, another vessel lying there discharging. On the 27th and on the 28th the master again reported from the anchorage, and was told that the consignee was not ready to receive him. December 31 he was ordered in and came to a point outside the dock, and was again told the berth was not ready for him, and the consignee would notify him in time to get there when it was ready. He accordingly went back to the anchorage at South Ferry. On January 1, 1890, the master was notified to come to the wharf, but was unable to do so on account of the wind and sea, but on January 3 succeeded in getting to the wharf. The consignee began to discharge the cargo on that day, and finished January 4 at 7.20 P. M.

Evidence was introduced tending to show that the master was notified on December 27 to come to the wharf. The conflicting evidence on this point was properly left to the jury, and we see no reason to disturb their conclusion upon it.

It was contended by the plaintiffs that when the schooner came to anchor in Dutch Island Harbor, and her master reported her as ready to go to the wharf at the Pier, she had arrived in the meaning of the bill of lading. It was contended by the defendant that the schooner did not arrive until actually at the wharf ready to be discharged.

It appeared, in support of the plaintiff's contention, that there is no harbor or anchorage ground at Narragansett Pier outside of the narrow dock or berth, where only one vessel can lie at a time ; that it is the usage of vessels carrying cargoes of coal to the pier, when they arrive at night, or when they arrive in the daytime and

perceive the berth to be occupied, to proceed to the place where this vessel anchored and thence report their arrival. The court at the trial instructed the jury that such a custom was reasonable, and, being proved, fixed the arrival at the time claimed by the plaintiffs. To this ruling the defendant excepted, and insists that it was erroneous. We think the evidence justified the construction adopted by the court and jury.

The contract expressed by the bill of lading bound the consignee to discharge the vessel within the time limited after arrival and report. *Neilson* v. *Jesup*, 30 Federal Reporter, 138; *North German Lloyd* v. *Heule*, 44 Federal Reporter, 100. When report was made at the usual place for the port, the sole impediment in the way of discharging was one for which the consignee had assumed the responsibility, lack of room at the wharf. *Clayton* v. *Four Hundred and Ten Tons of Coal*, 20 Federal Reporter, 799; *The Z. L. Adams*, 26 Federal Reporter, 655; *Bowen* v. *Decker*, 18 Federal Reporter, 751. Any subsequent delay, from the weather or causes not arising from the fault of the vessel, would have been avoided if the berth had been provided according to agreement, and is among the risks assumed by the consignee. *Field* v. *Chase*, Hill & Denio, 50; *Davis* v. *Wallace*, 3 Clifford, 123, 130. The cases cited by the defendant proceed upon the custom of the ports where demurrage was claimed; it being shown that, in the ports referred to, the place where vessels are accustomed to wait for assignment to their berths is at the entrance of the dock, not at the mouth of the river, and that lay days, by the custom of these ports, begin on arrival at the dock. Vessels at these ports, having come to the point where they are authorized by custom to call for an assignment of places, having done all that on their part is reasonably required to entitle them to call on the consignee for a place to unload, are entitled to begin to reckon their lay days. It is well settled that, when the bill of lading does not specify when the lay days are to begin, the custom and usage of the port must govern. *Higgins* v. *United States Mail S. S. Co.* 3 Blatchf. 282.

In *Reed* v. *Weld*, 6 Federal Reporter, 304, a vessel called the Mary H. Stockham, which was bound, with a bill of lading similar to the one under consideration, from Elizabethport, N. J., to

"above three bridges, South End, Boston," on her arrival at the lower bridge was stopped by an order from the consignees to report to them before going through the bridges. The master went ashore and was told by the consignees that their wharf above the three bridges was full, and he would have to wait before discharging his cargo until they could sell the coal. After some further delay he was directed to deliver the cargo at another wharf, above four bridges, at the North End. The court held that the voyage ended at the first stop below the bridges.

In *Choate* v. *Meredith*, 1 Holmes, 500, Judge Shepley distinguishes between the old bill of lading, which he had ruled required arrival at the wharf, and the new bill of lading, which began the lay days at the time of arriving in the port and reporting.

While the cases cited differ somewhat from the case at bar, they recognize the principle that "arrival" as used in the new bill of lading means coming to the place, whether indicated by custom of the port, or by direction of the consignee, or by definition in the bill of lading, at which the master may report his vessel as ready to deliver her cargo, and may call upon the consignee to provide a place for delivery.

We conclude that when the master reported his arrival, December 24, at 7.20 o'clock A. M., the time specified in the bill of lading began to run. The computation from that time is not questioned, and supports the verdict of the jury.

*Petition dismissed.*

*Samuel W. K. Allen*, for plaintiffs.
*William P. Sheffield*, for defendant.