CARROLL et al. v. HOLWAY et al.

(District Court, D. Maine. January 6, 1908.)

No. 44.

1. SHIPPING—INJURY OF VESSEL AT UNSAFE DOCK—LIABILITY OF CHARTERER.

The charterers of a vessel who were charged by the charter party with the duty of discharging her and with furnishing her with a suitable berth are liable for her injury while lying in a dock to which they assigned her, and which was not used by vessels of her size, by reason of the dangerous condition of the bottom where they failed to exercise reasonable care, or, in fact, any care, to ascertain its condition.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Shipping, §§ 219–221.]

2. SAME—LIABILITY OF CONSIGNEES AND ASSIGNEES OF BILLS OF LADING.

Assignees of the bills of lading of the cargo of a vessel are under the same duty as the original consignees with respect to furnishing the vessel with a suitable place at which to discharge, and are liable for damages sustained by her by reason of their having assigned her to an unsafe berth.

3. **SAME.**

The master of a vessel in placing her for discharging in a dock designated by the consignee of the cargo, with which he was unacquainted, had a right to assume that such dock was a suitable and safe place and to rely upon the performance by the consignee of his duty to exercise reasonable care to know that it was so, and he did not assume the risk nor waive any right as against the consignee by refusing to take. the responsibility of moving his vessel on hearing a rumor that the dock was unsafe, where he communicated such rumor to the consignee, and was told by him that it was unreliable, and that the dock was all right.

4. **SAME—DEMURRAGE—LAY DAYS FOR DISCHARGING UNDER "NEW BILL OF LADING."**

Where a charter party provided that the terms of the "new bill of lading" should govern as to the receipt and discharge of the cargo of a schooner, which was less than 400 tons of coal, the lay days for discharging began 24 hours after the vessel arrived at the port of discharge and notice of her arrival was given to the consignee, whose duty it was to designate a suitable berth for unloading within that time; but, where a berth was so designated, the docking of the vessel devolved upon the master, and any delay in docking is to be deducted.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Shipping, § 576.]

5. **SAME.**

A vessel is entitled to recover demurrage for delay beyond the lay days allowed by the contract for discharging caused by her sinking at the dock through the negligence of the consignees.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Shipping, § 576.]

6. **SAME—NOTICE TO CONSIGNEE OF ARRIVAL OF VESSEL—SUFFICIENCY.**

No particular form is required for a notice to a consignee of the arrival of a vessel to be discharged by him, but it is sufficient if he actually receives such notice from a third person, and a notice given on Sunday is also sufficient.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Shipping, § 579.]

In Admiralty.

B. Thompson, for libelants.

W. R. Pattengall and Jos. B. Reed, for respondents.

HALE, District Judge. This libel is brought by the owners of the schooner Flyaway to recover damages sustained by her at Machias, Me., while occupying a wharf designated by the respondents for the discharge of a cargo of coal. The schooner is a two-masted vessel of the burden of 132 tons. She is 96 feet long, and about 27 feet beam. Her draft loaded is 10¾ to 11 feet forward and 11½ feet aft. At the time of her injury she was chartered to the respondent, Samuel M. Holway, under a charter providing that the schooner should load at Weehawken, N. J., a cargo of 225 tons of anthracite coal for Machias, Me., with the privilege of discharging part of the cargo at Machias-port. The other respondents were owners of the cargo. The freight was to be 80 cents per ton and discharge, for all delivered, "new bill of lading." The charter also provided that the schooner should have a cargo of laths back to New York at the fixed rate of 75 cents per 1,000 for all delivered, custom of the port for loading and discharging to be observed as customary, suitable berth to be furnished the vessel at Machias for discharging and loading. In pursuance of this contract, the vessel received on board at Weehawken 232 tons of coal, and proceeded on her voyage to Machias. Her master Capt. Ansell E. Carroll,

had never been to Machias, and was not acquainted with that locality. She arrived at Machias Bay on Sunday afternoon, August 19th, and came to anchor off Round Island between 3 and 4 o'clock. One of the respondents, George P. Boynton, states that he got notice of her arrival on Sunday from Capt. Bulson of the steamtug Samuel B. Jones, who towed the schooner up the Machias river, which is so crooked that deep draft vessels are always towed from the bay to the wharves. Mr. Boynton also arranged for the discharge of the Flyaway's cargo at Donworth's Dock, and directed Capt. Bulson to berth her at that place. In compliance with the instructions of Mr. Boynton, Capt. Bulson towed the schooner to the dock on Tuesday, August 21st, where Mr. Boynton had teams and men ready for the discharge of the cargo. It appears by the testimony that Donworth's Wharf was formerly used to load vessels for the West Indies; but that of late years it had not been occupied, except for small vessels for a brief stay. It is located on the easterly side of Machias river, about 100 feet below Longfellow's Wharf, which is owned and occupied by I. P. Longfellow in carrying on the coal business. The latter wharf projects out into the river a little more than Donworth's Wharf; and it appears in testimony that the effect of this projection is such that the current produces an eddy which has had a perceptible effect in scouring out the bottom of Donworth's Dock. It appears, further, in testimony that the Flyaway arrived at this dock on Tuesday, August 21st, between 11 and 11:30 a. m., and that it was near high water at that time. When she reached the dock, she was dropped alongside; and the stevedore's crew, employed by the respondent, made the vessel's lines fast. Mr. Boynton was on the wharf; and Capt. Carroll asked him about the dock. Mr. Boynton told him that, so far as he knew, the dock was all right. After dinner, and when the tide had been ebbing for some time, a stevedore by the name of Edgar Reynolds, who had been loading a vessel on the opposite side of the river, came on board the Flyaway, and told Capt. Carroll that the dock was a bad place for vessels to lie in, and that, if he could move, he had better do so. Capt. Carroll testifies that:

"Reynolds said he didn't know anything about the bottom; but vessels had been damaged there before, and he was sure this would be."

It appears further by the testimony that Reynolds had no definite knowledge of the wharf, except what he had heard; that he had never sounded out the dock, nor had he seen anyone else do it. After this talk with Mr. Reynolds, Capt. Carroll made soundings on the outside of the vessel. He found sawdust and edgings, but nothing that would injure the vessel. Mr. Boynton came on the wharf soon after, and Capt. Carroll testifies:

"I went on the wharf and informed him that I understood this was a poor place to lay in."

And this testimony follows:

"Q. What did he say?

"A. He said he didn't know of any trouble. I told him of the man coming and informing me, and he asked me who it was. I said 'I didn't know.' He said it must have been Reynolds, and he said, 'They know too much.'

"Q. Any further talk? A. No, sir.

"Q. Say anything about shifting her?

"A. Yes; we talked about that. I said, if he wanted to shift her, I wouldn't take the responsibility on an ebb tide. I asked him about the ebb and flow of the tide, and he said he didn't know. * * *

"Q. Did you have any talk with him at that time in regard to your charter that you were to have a suitable berth to load and discharge?

"A. Yes, sir.

"Q. What did you say to him?

"A. I told him we was to have a suitable berth for loading and discharging at Machias.

"Q. What did he say?

"A. He said so far as he knew this berth was all right, and he told me where the cargo was to be loaded and pointed the laths out to me.

"Q. Did you ever say anything to him in regard to responsibility in case the vessel was in trouble?

"A. Yes, sir.

"Q. What did you say?

"A. I told him that if there was any damage done to this vessel I should hold him responsible for it.

"Q. What did he say?

"A. He said that everything was all right."

The schooner was docked between 11 and 12 o'clock on August 21st. The discharge of her cargo actually began about 2 o'clock. Within less than two hours after that time the pumps could not get a suck; and an examination showed three feet of water in the hold. Soon after the pumps were shoved up, the vessel opened up around the house, the arch boards were off 2 or 3 inches, the rigging was slack, the spring stay was hanging in a bight, the partitions in the cabin were broken down; the vessel was cracking and snapping, and the water in the hold was on a level with the water in the river. It was found impossible to relieve the vessel. On the next high tide the water covered the top of the schooner's house; and she did not float. By discharging part of the cargo on the low water, by obtaining extra pumps, and with the assistance of the steamtug, the vessel was floated on the following Friday, and taken to another berth, where, on August 28th, her discharge was completed. When she was hauled out, her bottom was found to be badly strained, and broken aft of the center. It was necessary to put in keelson, riders, and bilge streaks. Upon examination it was found that the bottom of the dock was hard, and, where the vessel's midships came, there was a hole five feet deeper than at the schooner's stem, and four feet deeper than at her stern.

1. Were the respondents at fault in failing to furnish a safe and suitable berth for the schooner?

It is evident that, under their contract, the respondents, the owners and consignees of the cargo, were required to furnish the libelant schooner with a reasonably safe berth for its discharge. The evidence shows, and it is now substantially admitted by the respondents, that the dock was unsafe and unsuitable.

In Look v. Portsmouth, K. & Y. St. Ry. (D. C.) 141 Fed. 182, this court considered a similar case, and held:

"That it is incumbent on a consignee, required by the charter to discharge a vessel, to designate a suitable place for her to lie while discharging, and to know, so far as by reasonable effort it can be ascertained, that such place is reasonably safe, and that this obligation extends to all the conditions in

which the vessel is placed and to all the dangers to which she is exposed while effecting her discharge, and that the consignee is responsible for the negligence or want of knowledge of its agent in charge of the work through which the vessel is injured."

In discussing the testimony, this court said:

"It is not necessary for the libelants to prove actual knowledge on the part of the respondent of any unfitness of the dock or of the wharf. It is sufficient that the respondent's agent had means of knowledge; for, while a consignee, upon whom is imposed the duty of discharging a vessel, does not guarantee its safety in coming to or lying at his wharf, he is bound to exercise diligence in ascertaining the condition of the dock and of the berths, and to give notice of any obstruction or of any danger to vessels. This subject has just received the attention of this court in Philadelphia & Reading Ry. Co. v. Walker (D. C.) 139 Fed. 855. This court has also considered a similar question, and has cited leading authorities upon it in Thompson v. Winslow (D. C.) 128 Fed. 73. The subject has also been fully discussed in the following cases: The Calvin P. Harris (D. C.) 33 Fed. 295; Hartford & New York Transportation Co. v. Hughes (D. C.) 125 Fed. 981; The Nellie (D. C.) 130 Fed. 213; Smith v. Burnett, 173 U. S. 430, 19 Sup. Ct. 442, 43 L. Ed. 756; Sawyer v. Oakman, Fed. Cas. No. 12,404; Garfield & Proctor Coal Co. v. Rockport & Rockland Lime Co., 184 Mass. 60, 67 N. E. 863; 61 L. R. A. 946, 100 Am. St. Rep. 543."

In the case at bar the respondents contend that they exercised reasonable care in the examination of the dock, and that they should not be held liable by reason of the want of such care. Under the testimony of the case, the court cannot sustain their contention. The respondents must have known that, in the Machias river, where spring and fall freshets occur, drift material is liable to be left upon the bottom of the river. Mr. Longfellow, the owner of the adjoining wharf, testified that every spring he takes two men and a boat and goes up and down his dock to see if there is a stick or log or anything in it to endanger a vessel, because he knows that at the time of the freshets there are sunken logs which are liable to lodge near the wharves. He says he often finds pieces of plank and butt ends which come from the mills; and, in order to clear the dock, he takes a grapple, and tows whatever he finds into the middle of the river to get it clear of the wharves; that he regards this as a reasonable precaution, and it takes him only one tide with two men to sound out the dock and clear it. Such conduct is only reasonable care. It is not shown that the respondents took such care. They knew, too, the location of the dock in respect to the longer wharf of Mr. Longfellow, and the dangers of scouring and gullying which have been pointed out in testimony.

In Smith v. Havemeyer (D. C.) 32 Fed. 844, Judge Addison Brown said:

"Such a wharf was plainly not a proper one, or in a proper condition below the water line to receive vessels for the discharge of cargo. The defendant, as the lessee and occupant of the wharf, is therefore prima facie chargeable with negligence. To exonerate himself, it was incumbent upon him to show reasonable care and examination in regard to the condition of the wharf and the slip. No proof on this subject being adduced, the prima facie liability must stand, and the respondents held to answer for the damages."

As I have indicated in the Look Case, supra, masters of vessels assigned to a dock have the right to assume that proper investigation has been made by the consignees respecting the safety of the dock.

In the case before me it does not appear that the consignees had taken any precautions in reference to investigating the condition of the dock. The testimony shows simply that they did not know its condition; that their agent, charged with the duty of caring for the dock, did not inform himself on the subject, but offers no justification for his lack of knowledge. The evidence convinces me that the defects in the wharf were such as could have been discovered by ordinary diligence. The respondents were clearly at fault for not exercising reasonable care in furnishing a suitable dock, which it was their duty to furnish, both under the general maritime law and under the contract of carriage. The evidence indicates that the defect was caused by the ebb tide running rapidly down by Longfellow's Wharf, causing the bottom to scour and gully out. If an examination had been made at proper intervals during the year, its condition could have been discovered; for the evidence tends to show that the dock had been in an unsafe condition for years.

The testimony leads me to the conclusion that all the respondents are at fault. The respondent Samuel M. Holway, the charterer, agreed to furnish the libelant schooner with a suitable dock in which to load and discharge. It is clear that he cannot relieve himself by any subsequent agreement with George P. Boynton and William C. Holway. Having intrusted the matter of the designation of a dock to George P. Boynton, he is liable for any negligence or want of reasonable care on the part of Boynton. The testimony shows that the respondents George P. Boynton and William C. Holway were the owners of the cargo and the assignees of the bill of lading of the cargo. As such, they were required to furnish the libelants' vessel with a reasonably safe berth for the discharging of her cargo. They would have had the same obligation if they had been the original consignees of the cargo. They are liable equally with Samuel M. Holway for any negligence or failure to furnish the schooner with a suitable berth. In fact, they admit that they are liable for the damages sustained by the Flyaway if Samuel M. Holway is so liable. Inasmuch as the respondents are under the same liabilities as if they had all been original consignees of the cargo, I sometimes in general terms refer to them, in this opinion as the "consignees."

2. Were the libelants also in fault?

In this case, as in the Look Case, supra, the libelants have the right to assume that the invitation of the respondents to come to a proper place and discharge was an assurance of safety, and that it was made with due knowledge of the premises. They are not at fault unless they have waived their rights under the charter party and under the general maritime law to have a suitable berth for the discharge of their cargo. It is insisted by the respondents that the rumor which Capt. Carroll heard put the duty of inquiry upon him, and that, if he consented to lie at this dock after hearing such rumor, he did it at his own risk, and must be held to have waived his right to look to the consignees for a suitable berth. I have already detailed the testimony as to Mr. Reynolds' visit to the Flyaway and as to his remark in reference to the dock. It appeared, however, from his conversation that he had no knowledge of it, and that he was merely relying upon rumors.

It will be remembered, too, that these rumors as to the character of the dock came to Capt. Carroll after the vessel had docked and after the tide had been ebbing for some time, so that it is doubtful if the vessel could have been moved to any other dock, even if such a course had been thought necessary, and, when Mr. Boynton came to the vessel very soon after Capt. Carroll had learned of these rumors, he gave the captain to understand that the statements of Reynolds were not to be relied upon. Under such circumstances, I cannot hold that it was the duty of Capt. Carroll to take the responsibility of moving his vessel. He had docked the schooner at the wharf which the consignees had designated, and which the covenants in his charter provided should be a suitable berth. He was assured by Mr. Boynton that the berth "was suitable as far as he knew," and that "everything was all right." I think he had the right to rely upon such assurance, and that it was not his duty to assume the responsibility of moving the vessel upon the mere rumor of a stranger that the wharf was unsuitable. The testimony shows that Mr. Boynton told Capt. Carroll that, if he did not think this was a suitable berth, he could haul his vessel into the next wharf; that Capt. Carroll said he would not do so, as he knew nothing about that dock; that, if Mr. Boynton wanted to, he could haul her to any place where she would be safe; and that Boynton expressly refused to take the responsibility of changing berths. The most that can be said as to the effect of that conversation is that it was an invitation by the respondents to Capt. Carroll to assume the risk of hauling his vessel out of a dock which they had designated, and to free them from the obligations of the charter, as well as from the duties which the law imposed upon them. Under the circumstances, it was not incumbent upon Capt. Carroll to assume the obligations which an attempt to move the vessel involved. Under his charter, as well as under the implied obligations which the law imposes on the consignees, he had a right to rely upon those whose duty it was to furnish his vessel with a safe berth for the discharge of her cargo.

The case at bar presents a situation somewhat similar to that of the Benedict in Look v. Portsmouth, etc., Railway, supra, where I referred to numerous cases which I need not incumber this opinion by citing. In that case I had occasion to say that the danger was not in the minds of either party. In that case the danger resulted from electric wires. In the case at bar it arose from a hollow dock. But neither the consignees nor Capt. Carroll had the slightest knowledge of the particular danger which menaced the vessel at Donworth's Dock. Even Mr. Reynolds, who carried the rumor of trouble to Capt. Carroll, did not know the particular difficulty. He merely knew that there was some trouble. In the case at bar, as in the Look Case, supra, I must hold "that the injury resulted from another and totally different cause of which both parties were ignorant, but concerning which it was the duty of the respondents to know, while it was not incumbent upon the captain to know."

Under all the circumstances, I am constrained to find that the libelants were not at fault.

3. Are the libelants entitled to recover demurrage for detention of the vessel?

The libel alleges, and the answer admits, that under the charter the terms of the "new bill of lading" were the conditions under which the cargo was to be discharged. The courts have invariably allowed oral evidence to be received to show what the "new bill of lading" in fact is. Kenyon v. Tucker, 17 R. I. 529, 23 Atl. 61.

The "new bill of lading" is often referred to by the courts as the "bill of lading of the vessel owners' and captains' association." The part which is material to the present matter reads as follows:

"And 24 hours after the arrival at the above named port, and notice thereof to the consignee named, there shall be allowed for receiving said cargo at the rate of one day, Sundays and legal holidays excepted for every one hundred tons thereof; after which, the cargo, consignee or assignee, shall pay demurrage at the rate of eight cents per ton a day, Sundays and legal holidays not excepted, upon the full amount of cargo, as per this bill of lading, for each and every day's detention, and pro rata for parts and portions of a day, beyond the days above specified, until the cargo is fully discharged."

Under the old bill of lading vessels were required to have actually arrived at the wharf before the lay days began; under the new bill of lading the lay days begin 24 hours after arrival in port and reporting. One of the earliest cases which clearly draws the distinction between the old bill of lading and the new is Choate v. Meredith, 1 Holmes, 500, Fed. Cas. No. 2,692, where Judge Shepley referred to the new bill of lading, and said:

"In the case of Aylward v. Smith (decided in this court at the October term, 1873) Fed. Cas. No. 687, affirming the decree of the District Court, it was held, in the case of a bill of lading in the old and usual form, with an agreement for demurrage 'after three days' that the lay days did not begin until after the arrival at the wharf; and as in that case the schooner was frozen up 35 feet from the wharf, which was too far for safe delivery of the cargo, that the voyage was not completed, and the lay days had not begun.

"In this case, as the contract stipulates that the lay days shall commence 'twenty-four hours after arrival at the port, and notice thereof to the consignee,' and as the vessel arrived at the port, and gave the notice to the consignee, and there were suitable wharves accessible, to which the consignee could have ordered the vessel, although his own wharf was obstructed, the time commenced to run 24 hours after the arrival and notice to the consignee.

"The new form of bill of lading seems to have been adopted to secure the shipowner against the delay consequent upon an obstruction of the consignee's wharf by other vessels or from other causes, and against his being compelled to await his turn to unload at the consignee's wharf. Under this form of bill of lading, if the consignee desires to exercise the right of requiring the master to unlade at the consignee's wharf, he must pay for the detention consequent upon that wharf's being inaccessible, if there are other suitable and convenient wharves accessible after the arrival of the vessel in port at which the vessel may be unladen."

The following cases have also fully recognized the distinction between the two bills of lading: Reed v. Weld (D. C.) 6 Fed. 304; Hall v. Eastwick, Fed. Cas. No. 5,930, 1 Lowell, 456; Manson v. N. Y., N. H. & H. R. Co. (C. C.) 31 Fed. 297, 299; Lake v. Hurd, 38 Conn. 536.

Within the meaning of the contract, then, the vessel must be held to have arrived when she came to the end of her voyage, and was reported. I find that she came to the end of her voyage on Sunday afternoon, August 19th, between 3 and 4 o'clock, when she anchored off Round Island in Machias Bay. Mr. Boynton himself testifies

that Round Island was the only feasible anchorage, and that it is customary for vessels to report their arrival from that point. Mr. Boynton further testifies that on Sunday afternoon he got notice of the Flyaway's arrival, and understood that she was then in the bay, and would be towed up on Tuesday. I find that the notice received by Mr. Boynton was sufficient in law and in fact. No particular form of notice was required. 268 Logs of Cedar, 2 Lowell, 378, Fed. Cas. No. 14,295.

Notice given Sunday is held also to be sufficient. Kenyon v. Tucker, supra.

The evidence shows that the schooner was, in fact, docked between 11 and 12 o'clock on Tuesday, August 21st. Her discharge was completed at noon on Tuesday, August 28th. By the contract and under the settled authorities, the vessel's time would begin to count 24 hours after notice was brought home to the consignees on Sunday afternoon, which would make her time count from Monday afternoon. But, although by the contract suitable berth was to be furnished by the consignees to the vessel at Machias for discharging and loading, the matter of the docking of the schooner devolved upon the master; and his delay in getting her docked cannot be charged to the consignees. In Smith v. Lee, 66 Fed. 344, 13 C. C. A. 506, in speaking for the Court of Appeals for this circuit, Judge Webb said:

"The 24-hour clause of the bill of lading, while it requires the consignee to be ready to receive the cargo at the expiration of that time after notice, and casts upon him any loss of time arising from delay in pointing out the place of discharge after the notice, does not relieve the vessel from herself being ready to deliver at the selected berth, provided it is safe and can be safely reached. Notice imposes on the master the duty to bring his vessel to the berth given her, and for any delay in so doing, not arising from the unsuitableness of the berth, or its approaches, or fault of the consignee, he is responsible, and must bear the loss."

See, also, Judge Lowell's decision in this circuit in Hall v. Eastwick, supra.

I find then that the schooner's time began to run at about 11:30 on Tuesday, August 21st.

The testimony shows that the schooner had on board 232 tons of coal. Under the new bill of lading applicable to vessels of a carrying capacity of 400 tons or less, the respondents would be entitled to 2 days, 7 hours, and 35 minutes in which to discharge her. She was not discharged within that time. I find her detention beyond her lay days was due to the default of the respondents, for the reasons which I have already given. In fact, the respondents concede that the delay in the discharging of the schooner was due to their fault, unless the court shall find that the sinking of the schooner was due in whole or in part to the fault of her master.

I find, then, that the libelants were without any fault which caused the sinking of the schooner or contributed to it, and that they are entitled to a decree for the damages so sustained, together with demurrage for the detention of their vessel beyond the lay days stipulated, commencing her time from her docking on Tuesday, August 21, 1906.

An assessor may be appointed to report the amount of the libelants' damages, in accordance with the terms of this opinion.