## MERRITT v. SPRAGUE.

(District Court, D. Maine. October 21, 1911.)

No. 140.

1. WHARVES (§ 20*)—INJURIES TO VESSELS—EVIDENCE—ABSENCE OF OTHER INJURIES.

In a suit to recover for injury to a vessel while in a dock discharging, from settling on the bottom, where it is shown that the condition of the bottom was dangerous to vessels and could have been readily discovered and remedied by proper examination, evidence that others had discharged there in safety is of little probative value.

[Ed. Note.—For other cases, see Wharves, Dec. Dig. § 20.*]

2. SHIPPING (§ 54*)—CHARTER—LIABILITY OF CHARTERER FOR INJURY TO VESSEL—UNSAFE BERTH.

Under a charter party requiring the charterer to "guarantee a safe and suitable berth for loading and discharging with sufficient water for reaching it and lying therein safely," the charterer is liable for an injury to the vessel while lying at the dock assigned her for discharging by reason of boulders and stones on the bottom upon which she rested at low tide, and it is no defense that he had no actual knowledge of the condition of the bottom.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 219–221; Dec. Dig. § 54.*]

3. SHIPPING (§ 54*)—CHARTER—INJURY TO VESSEL FROM UNSAFE BERTH—CONTRIBUTORY FAULT.

The master of a vessel, in placing her in a dock for discharging with which he is himself unacquainted, but which is designated by the charterer, has the right to assume that the dock is suitable and safe, and is not chargeable with contributory fault for her injury because of the dangerous condition of the bottom.

[Ed. Note.—For other cases, see Shipping, Dec. Dig. § 54.*]

In Admiralty. Suit by William Merritt, master of the schooner Stella B. Kaplan, against Phineas W. Sprague. Decree for libelant.

Benjamin Thompson, for libelant.
Carver, Wardner & Goodwin, for defendant.

HALE, District Judge. This libel in admiralty is brought by the master, in behalf of himself and his co-owners, of the schooner Stella B. Kaplan, to recover damages for breach of a charter party dated June 24, 1909. The contract provides for the carriage of coal from Newport News to Bangor, Me., to be discharged free of all expense to the vessel. It contains the provision that the vessel is to be tight, staunch, strong, and in every way fitted for the voyage. The libel alleges the breach of the following clause in the charter party:

"The charterer to guarantee a safe and suitable berth for loading and discharging, with sufficient water for reaching it and lying therein safely."

The libelant says that, under the contract, it was the duty of the respondent to furnish the vessel with a berth at which she could lie in safety while discharging her cargo; that the respondent failed to furnish such berth; but that, at Brewer, on the Penobscot river, opposite Bangor, the respondent furnished an unsafe and unsuitable berth, with a hard and uneven bottom, with insufficient water for a vessel of her character and draught to lie safely; that the schooner was greatly and permanently damaged by reason of a defect in the bottom of the dock, and was thereby detained in order to make repairs.

The respondent says that the schooner, at the date of the contract, and up to the time of the alleged injury, was not tight, staunch, strong, and fitted for the voyage; but that her timbers were old and rotten; that, not long before, she had been badly strained, and her timbers weakened; that, during the voyage from Newport News to Bangor, she was in collision with the steamship Georgia of the Maine Steamship Company's line, and was severely strained and damaged; that her injury was occasioned by her own unseaworthy condition and by the negligence and incompetence of her master, and not by the character of the berth in which she was lying.

The issues brought before the court are: Was the schooner at the date of the charter party, June 24, 1909, and up to the time of her docking at Bangor, staunch, strong, and in every way well fitted for the voyage for which she was chartered?

Did the charterer provide a safe and suitable berth for loading and discharging the schooner, with sufficient water for reaching it and lying therein safely?

Did the damage which the schooner sustained, and the detention which she suffered, arise from the fault of the charterer and from his breach of the contract, or from other causes for which the charterer was not responsible?

Was the libelant at fault?

Upon all these issues there is a great conflict of testimony. The trial has proceeded at great length, and has been conducted with skill and ability by able counsel upon both sides. It is hardly necessary to state more than the conclusions of the court upon each one of the above questions. It would serve no good purpose to analyze, or even to state, the conflicting testimony.

At the date of the contract of charter, June 24, 1909, and up to the time of her docking at Bangor, on July 20, 1909, was the schooner tight, staunch, strong, and in every way well fitted for the voyage for which she was chartered?

The Stella B. Kaplan is a four-mastered schooner of the burden of 1,025 tons, and of a coal-carrying capacity of over 1,700 tons, built by the New England Company at Bath, in 1891; 186 feet and some inches on her keel; 40 feet and 3 inches, beam; loaded, she draws about 21½ feet. In 1907 she was in collision. Her whole port bow was carried away, and she was rebuilt from stem to main-rigging. The respondent has offered evidence tending to show that, at the time she was docked, the schooner was hogged about 16 or 17 inches; her principal pump was broken and useless; there was a large amount

of water in her hold; she had received a severe shock by her collision with the Georgia, and had been severely strained, the injury causing her seams, butts, and wood ends to open, and the cement with which the seams were filled to crack and fall out, which caused her to leak; at the time of her docking she was not in a condition to ground on the bottom, which her captain knew to be hard; and she was not staunch, and strong, nor fit to take the bottom.

The testimony on behalf of the libelant tends to show that the Kaplan was a well-built vessel; she had been kept in good seaworthy condition; she was largely rebuilt in 1907; she was kept in good repair, and in staunch and seaworthy condition, and was in such condition at the time of her docking at Bangor; while on the passage from Newport News to Bangor, near the westerly entrance of Vineyard Sound, she was run into by the Georgia, a vessel of about 1,400 tons, on passage from Portland to New York; the Georgia struck the Kaplan's port cathead, and grazed the fore-rigging; the steamer's guard bent three of the forward chain-plates on the schooner and carried away the outer jib guy on the port side; and this was the substance of the injury; Capt. Johnson of the Georgia, after the collision, came back to the Kaplan and offered to assist, but could not see that she was damaged; and Capt. Merritt of the Kaplan stated that she was not injured, and did not require aid; after the injury at the dock she was fully repaired at South Portland; the injury occasioned by the collision was clearly distinguishable from her other injury; and the amount paid for repairs occasioned by such collision was only a little over $80.

After a careful examination of all the testimony upon this point, I am clearly of the opinion that, if the Kaplan had received by the collision such injuries as the respondent alleges, she would not have been able to reach port at Bangor. Injuries of the nature which she suffered could not, I think, have existed before she went to the dock; if they had existed, she would have sunk in deep water. From the whole testimony I am satisfied that when she came to her dock at Bangor she was in a condition to meet the requirements of her charter, that she should be tight, staunch, and strong, and fitted for the voyage.

Was the dock designated by the charterer for the discharge of the schooner a safe and suitable berth for a vessel of her class, with sufficient water for reaching it and lying there in safety?

The wharf of the Eastern Manufacturing Company was assigned by the charterer to the Kaplan, for her discharge. It is located on the Brewer side of the Penobscot river, opposite Bangor. The bulkhead against which a vessel lies while discharging her cargo extends out into the river about 150 feet from the shore, and up and down the river for a distance of about 90 feet, and about 35 feet in toward the shore. From the bulkhead, a discharging stage, supported by shears, runs out over the hatches of the vessel, so that the cargo, as it is hoisted from the vessel's hold, may be wheeled in towards the shore. Vessels consigned to this wharf are discharged by George A. De Rusha, who, in behalf of the Eastern Manufacturing Company, had full control of the discharging of all vessels. The testimony as

to the character of the bottom was so contradictory and unsatisfactory that, during the progress of the hearing, the court appointed a well-known Portland engineer of high character to go to Bangor and sound out the dock, with the view of determining, as accurately as possible, the depth of water and character of the bottom; instructing him to determine the character of the bottom as to hardness, and, if there were any rocks or obstructions, to locate them as far as practicable, and determine their size. The engineer was also authorized to employ the services of a diver if he should find such services were required, in order to get the necessary information. The engineer, Mr. Richardson, made a careful examination, and full report, and gave his testimony in court. He reported the bottom to be very hard and stony; "that the bed of the river, uncovered at low water both above and below this point, is so thickly covered with cobblestones that, viewing it from a point 50 feet away, it looks absolutely like an old-fashioned gutter paved with cobblestones." He discovered a boulder at about the point where it is claimed that the forefoot of the Kaplan rested. From his testimony, and from that of Mr. Chase, the diver employed by him, this boulder appears to have been about 4 by 6 feet on top, and from 18 to 24 inches, rise. The diver further reported that he found "quite a number of round, boulder like rocks at intervals, from about the size of a water pail and larger." He further reported:

"From the center of the wharf or near, going up river, the bottom rises, therefore making less depth of water at that end."

The engineer reported, and his soundings showed, quite a number of boulders, and that "boulders were thicker at the upper end of the berth than at the lower, and the iron seemed to indicate that they were from one to two cubic feet in size." He also reported that on the morning when the diver examined the bottom he found another vessel had hauled in overnight, and was ready to discharge her cargo; and that this vessel, the Fanny C. Bowen, was about the length of the Kaplan, with about 2 feet less beam. His report indicates that the Bowen was lying at about the place where the Kaplan laid, and that, at her stem, and just outside of her keel, was a boulder such as the diver has described.

[1] There was evidence in the case that other large vessels had used the dock of the Eastern Manufacturing Company with safety. It has been frequently pointed out by courts that this class of testimony is valuable to show that under some circumstances the dock could be used without occasioning injury to vessels using it; but that such evidence is not of great probative value when it is proved that there were defects capable of producing mischief, and that such defects could have been readily discovered and remedied by proper examination. Smith v. Havemeyer (C. C.) 36 Fed. 927; The Nellie (D. C.) 130 Fed. 213, 216.

[2] In considering the duty of the respondent, the charterer, with reference to designation of the dock, it is clear that he cannot relieve himself of responsibility by showing that he did not have knowledge of the condition of the bottom at the time he consigned the schooner to the dock for her discharge. This court has passed upon this ques-

tion, where it arose upon a contract of the charterer to discharge a vessel, without the special provision of guaranty which is found in the charter now before me. In accordance with the well-settled law, the court held:

"It is incumbent on a consignee, required by the charter to discharge a vessel, to designate a suitable place for her to lie while discharging, and to know, as far as by reasonable effort it can be ascertained, that such place is reasonably safe; and this obligation extends to all the conditions in which the vessel is placed and to all the dangers to which she is exposed while effecting her discharge, and the consignee is responsible for the negligence or want of knowledge of its agent in charge of the work, through which the vessel is injured." Look et al. v. Portsmouth, K. & Y. St. Ry. (D. C.) 141 Fed. 182.

A similar question arose in Philadelphia & Reading Ry. Co. v. Walker (D. C.) 139 Fed. 855, and in Carroll v. Holway (D. C.) 158 Fed. 328.

In the case at bar, the respondent cannot escape responsibility by showing that he did not in fact have knowledge of the condition of the dock of the Eastern Manufacturing Company at the time the schooner was consigned there for her discharge. The defects which I find in the dock were clearly discoverable by the exercise of reasonable care. If, upon examination of the Kaplan, the charterer's agent found it doubtful whether the dock were suitable for a vessel of her length, beam, and draught, he clearly should have lightered her cargo or have towed her away from the dock, so she would not take the bottom at low water. The charterer was responsible. He should have known the character of the dock. The captain of the vessel did not know the dock, and is not chargeable with knowledge. Smith v. Burnett, 173 U. S. 430, 19 Sup. Ct. 442, 43 L. Ed. 756; Smith v. Havemeyer (C. C.) 36 Fed. 927; Hartford & New York Transp. Co. v. Hughes (D. C.) 125 Fed. 981; Sawyer v. Oakman, Fed. Cas. No. 12,404.

From the testimony of the engineer appointed by the court, and from that of his diver, and from the whole evidence in the case, I am of the opinion that there were boulders and large rocks in the upper part of the berth which rendered the bottom of the dock unsafe for vessels of the size and character of the Kaplan, and that there was not sufficient water in the dock for her to lie therein with safety. I think the respondent failed to meet the terms of the charter party, in that he did not provide a safe and suitable berth for loading and discharging the schooner, with sufficient water for reaching it and lying therein safely. I think he was further at fault in that prior to the docking he did not provide either for the lightering of her cargo, or for her discharge in such a way that she would not have grounded. In that way she would have avoided all risk of grounding on the boulder or upon the large rocks in the upper part of the berth. The testimony leads me to believe that the charterer could have effected her unloading in safety, either by having her discharge begun at the afterhatch, and then hauling her astern before low water, or by towing her to a suitable anchorage before she took bottom on the low water.

Did the damage which the schooner sustained arise from the defect in the dock? I have already called attention to the testimony of the engineer and the diver regarding the existence of certain rocks and of a boulder in that part of the dock where the stem of the Kaplan was lying. The injuries to the vessel were forward. Her shoe was crushed for a distance of about six feet; her stem was started from the wood ends; she showed signs of strain on the rail, and in the butts on her deck, well forward. From all the testimony in the case it seems clear to me that such an injury, and such open and leaking condition, could not have existed for any length of time without the schooner requiring a constant operation of her pumps, and the testimony shows that very little use of her pumps was required until she grounded in the dock. Capt. Humphrey, a very experienced shipmaster, on whom I have often relied in matters requiring expert testimony upon maritime subjects, made an examination of the schooner at Bangor and after she was hauled out on the railway, and has testified that he could see she had a bad strain forward, and that from the forecastle head it looked as though the stem had pulled away from the wood ends; he saw "that six or eight feet of the schooner's shoe was 'squashed' out on each side, and part of the lower keel was split at the forward end as the vessel bore so hard; and he could then tell that her stem was started, and the injury looked new." I think the injury suffered by the vessel was the natural outcome of the grounding of her forefoot upon some hard substance in the dock, while her afterpart was afloat. From the whole testimony I am satisfied that her injuries arose from the effect of the grounding.

[3] The evidence does not sustain the defense set up by the respondent that Capt. Merritt was at fault. It is well settled that, in this class of cases, contributory negligence is a matter of defense. Smith v. Havemeyer (C. C.) 36 Fed. 927; The Nellie (D. C.) 130 Fed. 213. In Carroll v. Holway (D. C.) 158 Fed. 328, this court held that the master of a vessel, in placing her in a dock with which he himself was unacquainted, but which had been designated by the consignee of the cargo, had a right to assume that such dock was a suitable and safe place, and rely upon the performance by the consignee of his duty.

In the case now before me, the duty of the charterer was fixed by the guaranty in the charter party. While Capt. Merritt was unfamiliar with the condition of the berth, the case shows he exercised all the care that he was called upon to exercise in the premises. He was not informed of the dangers to which the vessel would be exposed while lying at the berth which the respondent had designated. The testimony does not lead me to find that he waived any of the provisions of the charter, or that he was guilty of any contributory negligence. The case shows that on the morning following the injury Capt. Merritt ordered discharging to continue. It is not necessary to inquire whether this was the wisest course to adopt. The action was taken after the injury occurred, to save as far as possible any further injury; and it does not appear that any subsequent injury was occasioned by the adoption of this measure. It appears, too, that this di-

rection was given by Capt. Merritt without any knowledge of the dangerous position in which his vessel had been placed. He adopted the measure in his effort to relieve the schooner in the position where the respondent had placed her. Whatever assurances Capt. Merritt received as to the nature of the bottom clearly tended to mislead him, rather than to put him upon further inquiry. The respondent has not, I think, made out his defense that the captain of the schooner was at fault.

The respondent must be held to answer for the damages to the schooner, and for her detention.

A decree may be entered for the libelant, with an order of reference to assess damages.