SUN CO. v. PHILADELPHIA TRANSPORTATION & LIGHTERAGE CO. et al.

GRAY v. SUN CO.

(District Court, E. D. Pennsylvania. July 9, 1917.)

Nos. 11, of 1910, and 12, of 1911.

1. SHIPPING ⟨⟩42—HIRING OF BARGE—WARRANTY OF SEAWORTHINESS.
    Where respondent, as owner, on request of a third party, furnished a barge for the carrier of merchandise for libelant at a stated hire per day, there was the same implied warranty of seaworthiness as though the parties had dealt with each other directly.

2. SHIPPING ⟨⟩121(1)—UNSEAWORTHINESS—ASSUMPTION OF RISK BY SHIPPER.
    The existence of an implied warranty of seaworthiness does not necessarily exclude the application of the doctrine of assumption of risk of unseaworthiness by a shipper, and in such case, where the unseaworthiness and the grave danger of loss of cargo are palpable and known to him, if

⟨⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

he allows the loading to proceed and the cargo to be taken by the vessel in her unfit condition, he assumes the risk of loss through such unseaworthiness.

**3. SHIPPING ⬥121(1)—UNSEAWORTHINESS—INJURY TO VESSEL IN DOCK.**

Respondent furnished a barge to carry merchandise for libelant from its dock to a steamship. On arrival at the dock, the master was told by libelant's representative that there was plenty of water for it to lie safely; but during the loading one corner settled upon an obstruction on the bottom, by which the barge was strained and commenced to leak to such extent as to be clearly unseaworthy before the loading was completed, and on being towed to the steamship sank before it could be unloaded. *Held*, that libelant not only assumed the risk to the cargo, but was liable for the damage caused by the sinking.

In Admiralty. Suit by the Sun Company against the Philadelphia Transportation & Lighterage Company and Jesse Gray, with cross-libel by Jesse Gray. Decree for respondent Gray on cross-libel.

Francis S. McIlhenny, of Philadelphia, Pa., and Convers & Kirlin, of New York City, for libelant.

Francis C. Adler and John F. Lewis, both of Philadelphia, Pa., for respondent Philadelphia Transportation & Lighterage Co.

Howard M. Long, of Philadelphia, Pa., for respondent Gray.

BRADFORD, District Judge. In this case a libel in personam has been filed by the Sun Company, owner of a quantity of oil in barrels, against the Philadelphia Transportation & Lighterage Company, hereinafter referred to as the transportation company, and Jesse Gray, owner of the barge Jesse Gray, hereinafter referred to as the barge, resulting from the loss of a number of barrels of oil caused by the sinking of the barge. A cross-libel in the form of an answer has been filed by Gray against the Sun Company to recover damages for injuries to the barge caused, as alleged, by the negligence of that company. The libel alleges in substance, among other things, that on or about November 2, 1909, the transportation company contracted with the libelant to furnish a barge at the rate of $8 per day to carry 1,000 barrels of oil from the libelant's works at Marcus Hook to the steamship Friesland, then loading at pier No. 53, south wharves, Philadelphia; that on or about November 4, 1909, the transportation company tendered the barge to the libelant under the above mentioned contract at the libelant's pier at Marcus Hook as ready to receive the cargo of oil for carriage as above set forth; that the barge was and continued under the command of Captain Henderson, who had been placed in charge of her by Gray, her owner; that on or about the last mentioned day the barge received from the libelant at its said pier 735 barrels of oil; that when this number of barrels had been loaded on her her captain refused to receive any more cargo, stating that to load any more barrels would make the barge unseaworthy; that the barge was then towed with the 735 barrels of oil on board to pier No. 53, where she arrived November 4, 1909, about 5 p. m.; that about 6:20 p. m. on the same day she sank with her cargo; that by reason of her sinking a large quantity of the oil was lost; that a certain amount of oil "mixed

with water" was recovered; that labor and services and the use of materials were necessitated in salving the oil from the water and in the towage and temporary storage of the barrels containing the same; that the sinking of the barge was due to her unseaworthiness without fault on the part of the libelant; that at the time the barge was tendered to the libelant and the oil was loaded upon her she was unseaworthy for the receipt and carriage of the cargo contracted for, and for the cargo actually received on board; and that the unseaworthy condition of the barge was not at the time known to the libelant.

The transportation company in its answer to the libel of the Sun Company, alleges in substance, among other things, that no sum whatever is due by it to the libelant by reason of the matters stated in the libel; that on the afternoon of November 2, 1909, the transportation company was requested by the libelant to furnish a barge for the purpose of carrying a cargo of oil in barrels from Marcus Hook to Philadelphia, and was informed by the transportation company that it had no barges or lighters for hire, but that Gray had a barge named the "Jesse Gray" that had been under charter to the transportation company, which the libelant could probably hire to carry the cargo of oil; that at the libelant's request the transportation company communicated with Gray and hired the barge for the libelant at the price of $8 per day; that the barge was tight, staunch and strong and in all respects seaworthy and fit to carry the cargo of oil; that she proceeded to Marcus Hook on the evening of November 3, 1909, arriving there about 9:15 the same evening and on the morning of November 4, 1909, commenced to load the cargo of oil in barrels; that upon the arrival of the barge at the libelant's wharf her master was informed by the libelant's representative that the dock contained plenty of water and was perfectly safe for the barge to lie at to be loaded; that subsequently by reason of the unsafe condition of the dock the barge became twisted and strained, and this condition was called to the attention of libelant's representative, but the libelant proceeded with the loading and when the same was completed the barge was taken in tow by the libelant's tug Minerva on the afternoon of November 4, 1909, and proceeded to Philadelphia where she arrived about 6 p. m. of the same day; that shortly after leaving the libelant's wharf at Marcus Hook the barge began to leak, due to the injury received by reason of the unsafe condition of the libelant's dock, and her master requested the master of the Minerva to put her pump into the barge to pump her out, as she was leaking so badly that it was necessary to do something to prevent her sinking, but the master of the barge was informed by the captain of the Minerva that her pump was not in working order, that in order to work said pump it would be necessary to stop the Minerva, and that the latter could not run while they were pumping the barge out; that when the Minerva and the barge reached the vicinity of the Horseshoe in the. Delaware river, the Minerva was relieved by the tug Cahill, and the latter then proceeded to tow the barge up the river to her destination; that when the barge arrived at pier 53 she had gone down so far that her deck was within ten inches of the water, and the Cahill's siphon at the request of the master of the barge was put in her

but was unable to relieve her from water and she sank at the dock and in consequence thereof a portion of her cargo was lost; and that the sinking of the barge and the loss of her cargo were not due to any unseaworthiness of the barge, but to the fault of the libelant in not furnishing a proper and safe dock for her to load at and in not furnishing a tug in a seaworthy condition and properly equipped to tow her to her destination.

Gray filed an answer to the libel of the Sun Company, intended to serve also as a cross-libel, in which he alleges in substance, among other things, that Captain Henderson had not been placed in charge of the barge by him, but on the contrary was placed in such charge by the transportation company; that no sum of money whatever is due by him to the libelant; that pursuant to an agreement on or about November 2, 1909, between the libelant and the transportation company the barge while under the command of Captain Henderson and under the control of the transportation company, being tight, staunch and strong, and in all respects seaworthy and fit to carry the cargo of oil, afterward loaded upon her, proceeded to Marcus Hook, and on the morning of November 4, 1909, the libelant commenced to load a cargo of oil in barrels upon her; that upon the arrival of the barge at the libelant's wharf her master was informed by the representative or agent of the libelant that the dock contained plenty of water and was perfectly safe for her to lay at and be loaded with said cargo; that subsequently a corner of the barge became caught on the bottom; that the loading of the cargo was completed and the barge thereupon left Marcus Hook in tow of the libelant's tug Minerva in the afternoon of November 4, 1909, and proceeded to Philadelphia where she arrived about 6 p. m. of the same day; that shortly after leaving the libelant's wharf the barge began to leak, due to the fact that she had become strained and twisted while lying ashore at libelant's dock by reason of its unsafe condition; that the fact of her having been ashore had been called to the attention of the libelant's representative or agent prior to the completion of the loading of her cargo; that her master thereupon requested the master of the tug Minerva to put the tug's pump into the barge to pump her out as she was leaking so badly that it was necessary to do something to prevent her sinking, but he was informed by the captain of the Minerva that her pump was not in working order and that in order to work it it would be necessary to stop the Minerva, as the tug could not run while pumping the barge out; that when the Minerva and the barge reached the vicinity of the Horseshoe in the Delaware river the Minerva was relieved by the tug Cahill and that tug proceeded with the barge in tow up the river to her destination; that when the barge arrived at pier 53 she had gone down so far that her deck was within ten inches of the water, and the Cahill's siphon at the request of the master of the barge was put in her, but was unable to relieve her from the water and she sank at the dock and in consequence of such sinking a portion of the cargo was lost; that the sinking of the barge and the loss of the cargo were not due to any unseaworthiness in her nor to any fault on the part of

Gray, but were solely due to the fault of the libelant in not furnishing to the barge a proper place to be loaded at and in not furnishing a tug in a seaworthy condition and properly equipped to tow her to her destination; and that by reason of the stranding of the barge at the libelant's dock and the twisting and straining of her as a result thereof she sank and was considerably damaged.

The libelant in its answer to the cross-libel of Gray takes issue on the material allegations therein contained touching the cause of and circumstances preceding and attending the alleged injury to the barge and her sinking and the loss of oil.

On most of the material and disputed points there is considerable conflict among the witnesses, and much care has been required to ascertain where the preponderance of the evidence, direct and circumstantial, determinative of this suit as a civil cause, is to be found. I shall not undertake in this opinion to discuss in extenso the evidence, but shall rather state controlling conclusions, only briefly referring to the evidence supporting them.

One of the principal points of dispute in the case is whether the transportation company on its own account by agreement with the libelant chartered the barge from Gray and undertook the carriage of the oil for the libelant, on the one hand, or on the other, procured the barge from Gray for the libelant merely as an accommodation or act of friendship to it and without entering into any agreement or incurring any responsibility for the carriage of the oil. On this subject there is much controversy. I find as a fact, established by what I believe to be a clear preponderance of the evidence, that what the transportation company did in the matter of procuring the barge was not done on its own account or for any pecuniary profit or advantage to be derived from it, but was solely an act of friendship for the accommodation of the libelant, and that there was no express or implied warranty of seaworthiness of the barge by the former company. It follows that the libel must be dismissed with costs as to the transportation company.

[1] Gray, the owner of the barge, did not deal directly with the libelant for her employment in the carriage of the oil from Marcus Hook to pier No. 53, and he contends that, therefore, there was no implied warranty to the libelant of her seaworthiness for the contemplated service. This position is untenable. He knew that the barge was to be employed by the libelant in the carriage of the oil and that he was to receive $8 per day as her hire to be paid by it. When he furnished the barge for that purpose there was an implied warranty that she was reasonably fit for that service, and that warranty in the absence of special circumstances would run and enure to the benefit of the shipper. Under the maxim "qui facit per alium facit per se," the arrangement had by Gray with the transportation company for the use by the libelant of the barge placed him in the same position with respect to an implied warranty as if he had dealt directly with the libelant.

[2] The existence of an implied warranty of seaworthiness does not, I think, necessarily exclude the application of the doctrine of

assumption of risk from unseaworthiness by a shipper and owner of merchandise. The implied warranty is a creation or implication of the law for the protection of those who in good faith and without knowledge or notice of unseaworthiness entrust goods or merchandise to a vessel for carriage. As a general rule and unless under special circumstances responsibility for the safe condition of the vessel rests upon her owner and not upon the shipper. But in the case of a mere implied warranty, where the unseaworthiness of the vessel and the grave danger of loss of the cargo are palpable, unmistakable and present to the mind of the shipper who, having power to prevent it, allows the loading of the cargo to proceed and to depart on the vessel in her unfit condition, he assumes the risk of loss through such unseaworthiness. For the law implies the warranty, not to encourage recklessness or bad faith on the part of the shipper, but for his protection while acting in good faith and in reliance, though mistaken or even careless, upon the sufficiency of the vessel for the contemplated voyage. It is urged that it is unwise and oppressive to impose upon the shipper the duty of passing judgment upon the sufficiency or insufficiency of the vessel at the risk of litigation and damages should it be judicially decided that he had without sufficient cause prevented the carriage of the cargo. This consideration is not without weight, and serves to show that even in the case of a mere implied warranty of seaworthiness, the shipper, unless under special circumstances as above mentioned, cannot be held to assume the risk of loss from unseaworthiness. But if the vessel from any cause has gotten into such faulty condition as reasonably and unavoidably to impress the shipper possessing ordinary prudence, with a sense of her unseaworthiness, under the principles of law as well as of equity the vessel owner should be estopped from holding the shipper liable in damages for preventing the carriage of the intended cargo. In The Scandinavia (D. C.) 156 Fed. 403, it was held that the doctrine of assumption of risk is applied in admiralty as fully as in other branches of jurisprudence, notwithstanding the rule that damages will in some cases of concurrent negligence be divided. That case, it is true, involved the question of liability for personal injuries. But I perceive no distinction in principle, so far as the applicability of the doctrine of assumption of risk is concerned, between a question of liability for personal injuries and a question of liability for the loss or destruction of one's goods. In that case it was held that the negligence of the libelant in using a manifestly unsafe ladder provided by the vessel was the "immediate and proximate cause of the injury." So in this case it was not the unseaworthiness of the barge, but the action of the libelant in permitting her to proceed with the barrels of oil, in her palpably unseaworthy condition, on her voyage from Marcus Hook to Philadelphia, that constituted the immediate and proximate cause of the injury. It abundantly appears from the evidence that during the loading of the barge, which continued from about 8 o'clock in the morning until after 1 o'clock in the afternoon, and several hours before her departure for Philadelphia, her unseaworthiness was recognized by those representing the libelant and by others actually engaged in the

loading or carriage of the oil, as fraught with extreme peril to the cargo—peril so manifest and grave as to involve assumption of risk by the libelant through persistence in the completion of the loading and in the carriage of the cargo on her.

[3] But, further, there was no breach by Gray of any implied warranty of unseaworthiness, for the evidence as a whole does not show that the barge was in an unseaworthy condition at the time she was tendered to and accepted by the libelant,

The loss of oil complained of was indisputably the result of the leaking and sinking of the barge, without any stress of weather to account for it. But there is much controversy as to the cause or causes to which her unseaworthy condition was attributable. Various theories of greater or less plausibility have been advanced to explain her defective condition during and after the loading of the cargo. It is urged by Gray and the transportation company that the libelant's dock was an unsafe place in which to load the barge, and much evidence has been directed to the presence within about a couple of feet from the bulkhead of a submerged end of a pile or other hidden obstruction upon the top of which it has been contended a corner of the barge settled with the falling tide and process of loading, thereby subjecting her to undue strain and causing her to spring a leak through the opening of her seams or otherwise. On the evidence it is not altogether clear that any corner of the barge was at any time, prior to or during the loading, close enough to the bulkhead to rest upon or over or touch the pile end or other hidden obstruction referred to. But it is quite clear that before the completion of the loading of the barge one of her corners did descend upon and become engaged with and remain suspended from some submerged obstruction of hard and unyielding nature whereby she was strained, twisted and caused to leak. It has been contended that before and at the time she was taken to Marcus Hook to receive the cargo of oil she was unseaworthy for the carriage of the cargo of oil, in that she was generally unsound and weak. But the evidence, as above stated, does not support this contention. It was the duty of the libelant as owner to keep the bottom of the dock free from hidden dangers whether consisting of submerged piles, rocks or other obstructions, calculated to cause damage to vessels occupying the dock in the course of business at its request. The master of the barge had a right, in the absence of knowledge on his part to the contrary, to assume that the berth assigned to her by the libelant for the loading of the cargo was suitable and safe for that purpose. Indeed, it appears from the evidence that on the arrival of the barge at the dock her master was informed by the representative or agent of the libelant that the dock contained plenty of water and was perfectly safe for her to lie in and be loaded with the intended cargo. This assurance, amounting to a guaranty, brings this case within the ruling of the court in Merritt v. Sprague (D. C.) 191 Fed. 627, where there was a recovery for injury to a vessel in the dock, the master of the vessel being unacquainted with the dangerous character of the bottom and the charterer having guaranteed a safe and suitable berth for loading and discharging. The libelant did not perform its duty to keep

the bottom of the dock in safe and proper condition, and the injury to the barge being directly attributable to such omission, the libelant must be held liable to Gray as her owner to the extent of such damage; there having been no assumption of risk nor any contributory negligence on the part of the master of the barge with respect to such damage.

A decree in accordance with this opinion may be prepared and submitted.